[No. B216686. Second Dist., Div. One. Aug. 28, 2009.]

S.T., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES et al., Real Parties in Interest.

1010

**COUNSEL**

Law Offices of Alex Iglesias, Steven D. Shenfeld and Karen Rose for Petitioner.

No appearance for Respondent.

Robert E. Kalunian, Acting County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Real Party in Interest Los Angeles County Department of Children and Family Services.

Children's Law Center of Los Angeles and Martha Matthews for Real Party in Interest Minor J.T.

**OPINION**

**ROTHSCHILD, J.**—Petitioner, S.T. (father), an incarcerated parent, seeks an extraordinary writ to vacate the orders of the juvenile court issued at a contested six-month review hearing terminating his reunification services and setting a permanency planning hearing as to his daughter, J.T. Father maintains that the court erred in believing that it had no discretion to continue services and in finding that the Los Angeles County Department of Children and Family Services (DCFS) had provided him with reasonable services. The DCFS and counsel for the minor agree that there would be no detriment to

the minor from continuing reunification services and therefore they do not oppose the requested relief. They assert, however, that the department did provide father with reasonable reunification services.

We will grant a writ directing the trial court to vacate its order and to reconsider continuing reunification services and setting a permanency planning hearing in accordance with the views expressed in this opinion.

## FACTS AND PROCEEDINGS BELOW

The facts are undisputed.

J.T. was born in September 2008 and detained at birth because she exhibited exposure to methamphetamine and both her father and her mother were incarcerated.[1] The DCFS placed J.T. with her paternal grandparents.

In November 2008 the court sustained a petition under Welfare and Institutions Code section 300, subdivision (b),[2] as to father on the ground that he has a history of illicit drug use and a conviction for unlawful possession of a controlled substance which endanger the child's physical and emotional health and safety. J.T. remained suitably placed with father's parents. The court ordered the DCFS to provide reunification services to father and ordered father to participate in DCFS-approved programs for drug rehabilitation, random drug testing, parenting education, and individual counseling to address "case issues and life issues." The court further ordered that while he was in custody father was to have no visits with J.T. He was awarded monitored visits twice a week upon his release.

The DCFS submitted two reports for the six-month review hearing held in June 2009.

In the first DCFS report, dated May 2009, the department stated that father remained incarcerated and was scheduled for release in November 2009. Meanwhile, J.T. remained in the home of her paternal grandparents. The report provided the following information with respect to father's court-ordered programs and services.

A DCFS worker spoke with "Mr. Carlos" at the Twin Towers Correctional Facility in January 2009 regarding father. Carlos told the worker that father

---

[1] Mother is not a party to this petition.

[2] All statutory references are to the Welfare and Institutions Code.

did not have a counselor who could speak to the worker about father's progress in his court-ordered programs. The jail offered drug counseling and parent education classes, Carlos told the worker, but to participate in them father would have to submit a request to the jail chaplain.[3] Carlos could provide the worker no further information about father. Later that same day the worker mailed a certified letter to father requesting he call the worker as soon as possible to discuss compliance with the juvenile court's orders.

In March 2009, father wrote to the DCFS worker from the Twin Towers Correctional Facility. He informed the worker that he was not allowed to make telephone calls. He also stated that while he was at Twin Towers Correctional Facility he was only able to attend one Narcotics Anonymous meeting and no classes "because this institution is always on lock down which means no movement whatsoever. No programs, no classes, no nothing period." Father advised the worker he was being transferred to a facility that he hoped would provide programs allowing him to comply with the court's order. "I would like you to know," he wrote, "that I am really trying my best to comply with these court ordered services."

The report further stated that sometime between March and April 2009, the DCFS learned that father had been transferred to a prison in Lancaster. A DCFS worker sent a letter to the prison in April 2009 requesting the name of father's counselor and asking whether drug rehabilitation, testing, parenting, and counseling programs were available to father.

The report also noted that the court had ordered that father have no visits with J.T. but that he had received pictures of her from his mother.

DCFS concluded its report by stating that father had not complied with the court's orders, had not completed a drug rehabilitation program, had not resolved the issues that brought J.T. to the department's attention and that returning the child to father would be detrimental to the child's safety and well-being. It asked the court to terminate father's family reunification services.

In a "last minute," report to the court on June 5, 2009, the DCFS changed its recommendation and recommended that father continue to receive family reunification services. The report stated that the department recently had received a letter from father stating "that he intends to comply with court

---

[3] The record does not show whether father knew of this procedure. Apparently he was able to attend one Narcotics Anonymous (N.A.) meeting. (See discussion below.)

orders as soon as he is able and would like to reunify with [J.T.]" The report also stated: "Based on the fact that communication with father has been limited and DCFS has not yet been able to communicate with father's counselor regarding what are the court orders, DCFS is now changing the recommendation to continuing family reunification services for father. This will allow the [child's social worker] to meet with father on a monthly basis, maintain regular communication with father's counselor, and determine the ability of father to reunify once released."

Father appeared in person and through his counsel at the six-month review hearing on June 8, 2009. The minor and the DCFS appeared through their counsel. The court began the discussion of reunification services by stating: "Father's in custody and, as far as I can tell, has done absolutely nothing. The department's response is . . . because they haven't been able to get in touch with [him], he's entitled to six more months of service. I'm not aware of any law that says that."

Counsel for the DCFS disputed the court's characterization of the facts and the department's legal position. After summarizing the facts contained in the two reports, discussed above, counsel told the court that after the June 5 report the department received a letter from father's counselor at the prison stating that none of the programs the court ordered father to attend are available at the prison. The letter further stated that although efforts had been made to transfer father to another prison where those services were available father had not yet been moved and remained on a waiting list. Finally, the prison counselor advised the worker that because father was close to the end of his sentence it was unlikely that he would be moved. Counsel advised the court that the department's legal position was that it "made all of the reasonable efforts [it] could probably make under the circumstances" but regardless of those efforts "there was nothing that the father could do." Counsel for the department concluded by observing that father had attended an N.A. meeting when it was available, had expressed his wish to "really change his life and reunify" with J.T. and that J.T. is residing with father's mother. For those reasons the department would not oppose continued reunification services for father

Counsel for J.T. told the court, "Whatever you come up with is okay with me because I don't think the child will be . . . in a detrimental situation either way."

Father argued that he should receive another six months of family reunification services because the DCFS had not made reasonable efforts to provide

the court-ordered services, he has attended N.A., the only service that has been available to him in jail or prison, his daughter is in a stable placement with his mother and neither the DCFS nor the child's counsel believe any detriment would result to the child in continuing reunification services.

"The issue," the court stated, is whether father had "regular and consistent contact with the child," had made "substantial progress in resolving the issues which led to jurisdiction," and had demonstrated "the capacity and ability to complete the objectives of the treatment program and provide for the child's safety, physical or emotional well-being and special needs." (See § 366.21, subd. (g)(1)(A)–(C).) After answering "no" to each of these questions, the court concluded that notwithstanding "this new prison stuff"[4] it could not make the findings necessary to continue reunification services. Therefore the court ordered that "reunification services are hereby terminated" and set a section 366.26 permanency planning hearing (.26 hearing) in October 2009 at which it would consider termination of parental rights.[5]

We hold that the court prejudicially erred in believing that it had no discretion to continue reunification services if father did not satisfy all three criteria found in section 366.21, subdivision (g)(1)(A)–(C). In light of this holding we need not decide whether the DCFS provided father with reasonable reunification services.

## DISCUSSION

### I. *THE COURT'S DISCRETION AT THE SIX-MONTH REVIEW TO CONTINUE REUNIFICATION SERVICES*

■ Section 366.21, subdivision (e) governs the procedure for children like J.T. who were under three years of age when they were initially removed and who are not being returned to a parent or guardian at the time of the six-month review hearing. If the court finds by clear and convincing evidence "that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court *may* schedule a hearing pursuant to Section 366.26 within 120 days." (§ 366.21, subd. (e), third par., italics added.) But, as the court recognized in *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 176 [83 Cal.Rptr.3d 864], "this inquiry does not *require* the court to schedule a .26 hearing ('the court *may* schedule a hearing')."

---

[4] Apparently the court was referring to amendments to the dependency statutes intended to improve the opportunities for incarcerated parents to reunify with their children. (Assem. Bill No. 2070 (2007–2008 Reg. Sess.); Stats. 2008, ch. 482, eff. Jan. 1, 2009.) We discuss the relevant amendments below.

[5] If the court orders a .26 hearing it must terminate family reunification services. (§ 366.21, subd. (h).)

(Original italics.) If the court does not return the child to the parent and does not schedule a .26 hearing then "the court shall direct that any reunification services previously ordered shall continue to be offered to the parent or legal guardian [until the 12-month review hearing] provided that the court may modify the terms and conditions of those services." (§ 366.21, subd. (e), seventh par.)[6]

In this case the court applied the wrong legal standard in determining whether to continue family reunification services or terminate them and set a .26 hearing. The court mistakenly believed that it lacked discretion to continue reunification services unless the three factors listed in section 366.21, subdivision (g)(1), (A)–(C) were satisfied. (See discussion, *ante*, pp. 1014–1016.) Although the court did not err in considering those factors, it erred in believing it had no discretion to continue reunification services if the factors were not met. (*M.V. v. Superior Court, supra*, 167 Cal.App.4th at pp. 180–181.)[7]

## II. *PREJUDICE TO FATHER*

A trial court's failure to exercise its discretion generally requires reversal. (*People v. Penoli* (1996) 46 Cal.App.4th 298, 302, 306 [53 Cal.Rptr.2d 825].) Affirmance is possible only if the appellate court can conclude the appellant suffered no prejudice either because it would have been an abuse of discretion to rule in the appellant's favor (*People v. Lang* (1989) 49 Cal.3d 991, 1011 [264 Cal.Rptr. 386, 782 P.2d 627]) or because it is not reasonably probable that the appellant would have obtained a more favorable result had the court exercised its discretion (*M.V. v. Superior Court, supra*, 167 Cal.App.4th at p. 183). In this case we cannot say that the court would have abused its discretion by continuing the period for reunification services or that it is not reasonably probable that the court would have exercised its discretion in father's favor.

■ A number of factors in this case weigh in favor of extending reunification services to father. Not the least of these is the Legislature's

---

[6] California Rules of Court, rule 5.710, subdivision (f)(11) states: "If the child is not returned and the court does not set a section 366.26 hearing, then the court must order that any reunification services previously ordered will continue to be offered to the parent or guardian, and the court may modify those services as appropriate. The court must set a date for the next review hearing no later than 12 months from the date the child entered foster care."

[7] For reasons that the *M.V.* opinion explains in detail, in some circumstances a parent may be required to satisfy the criteria in section 366.21, subdivision (g)(1) in order to receive reunification services beyond the 12-month review. (*M.V. v. Superior Court, supra*, 167 Cal.App.4th at pp. 179–182.)

policy of encouraging the reunification of families of incarcerated parents by easing the difficulties such parents encounter in attempting to obtain services and maintain contact with their children. This policy is reflected in the amendments to the law governing reunification services and review hearings contained in Assembly Bill No. 2070 (2007–2008 Reg. Sess.), enacted as Statutes 2008, chapter 482, effective January 1, 2009. According to the author of this legislation, "requirements that parents must meet to reunify with their children 'are virtually impossible for incarcerated parents to fulfill, regardless of their fitness as parents . . . . In addition, the time period during which parents must complete reunification services normally ranges from 6 to 12 months, regardless of the actual availability of these services.' " (Assem. Com. on Human Services, Analysis of Assem. Bill No. 2070 (2007–2008 Reg. Sess.) as amended Mar. 28, 2008, p. 3.) The County Welfare Directors Association of California stated it supported the legislation because "the best interest of the child continue[s] to be of paramount consideration by the court, while recognizing that parents who are in prison should have their specific situations taken into account." (*Id.* at p. 5.) The association also noted that facilitating reunification of families who have a parent in prison would reduce the number of children placed in long-term foster care. (*Ibid.*)

■ To address prisoners' barriers to reunification services the legislation provided among other things that in deciding what programs and services to order the court must "consider the particular barriers to an incarcerated . . . parent's access to those court-mandated services . . . and shall document this information in the child's case plan." (§ 361.5, subd. (e), as amended by Stats. 2009, ch. 482, § 1.7.) The same legislation prohibits the court from ordering an incarcerated parent to participate in counseling or other treatment services if "the correctional facility in which he or she is incarcerated does not provide access to the treatment services." (§ 361.5, subd. (a), as amended by Stats. 2009, ch. 482, § 1.7.) Assembly Bill No. 2070 (2007–2008 Reg. Sess.) requires that the court, when considering whether to return the child to the parent, "tak[e] into account the particular barriers to an incarcerated or institutionalized parent or legal guardian's access to . . . court-mandated services and ability to maintain contact with his or her child." (§ 366.21, subd. (e), first par., as amended by Stats. 2009, ch. 482, § 2.)

■ We do not, of course, suggest that father's inability to participate in rehabilitative services and his inability to have contact with his daughter due to incarceration are the only facts the court should consider in exercising its discretion, but given the child's safe placement with her paternal grandparents, father's shortly expected release from prison, and his apparently sincere desire to reunite with his daughter, they are important considerations.

## DISPOSITION

The petition for extraordinary writ is granted. Let a writ issue directing the juvenile court to vacate its order terminating reunification services and setting a permanent plan selection hearing under section 366.26. The court is directed to hold a new six-month review hearing and exercise its discretion under section 366.21, subdivision (e), to continue or terminate reunification services consistent with the views expressed in this opinion. The hearing under section 366.26 scheduled for October 5, 2009, is stayed pending issuance of our remittitur.

Mallano, P. J., and Miller, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.