Filed 2/3/14  In re Audrey P. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AUDREY P. et al., | B250935 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. CK01702) |
| RODNEY P., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in extraordinary writ.  Philip Soto, Judge.  Petition granted and peremptory writ issued.

Law Offices of Katherine Anderson, Anuradha Khemka and Jennifer Pichotta for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Associate County Counsel, for Real Party in Interest.

# INTRODUCTION

Petitioner Rodney P. (Father), the father of Audrey P. and K.P., minors coming under the juvenile court law (Welf. & Inst. Code, § 300),[1] seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) to review a juvenile court order terminating his family reunification services and setting a permanency hearing under section 366.26 for 120 days after his six-month review hearing (§ 366.21, subd. (e)).  We find that substantial evidence does not support the determination that Father did not make substantive progress in his treatment plan, and we thus issue a writ of mandate directing the court to vacate its order setting a section 366.26 hearing and terminating Father's reunification services, and to issue a new order continuing the case to the 12–month review hearing under section 366.22, subdivision (f) and reinstating family reunification services until the date of that hearing.

# FACTUAL AND PROCEDURAL BACKGROUND

*Jurisdictional Findings and Case Plan*

On November 2, 2012, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of Audrey and K., based on illicit drug use by Father and their mother, Kelly W. (Mother).  On October 30, 2012, local building code enforcement, accompanied by the police, conducted a walk-through of all the units in Mother's and Father's apartment building due to their deplorable condition, and observed 17-month old Audrey and three-month old K. sleeping unattended on a dirty living room floor.  When the police entered the apartment, the parents emerged from their bedroom, and Father appeared to be under the influence of narcotics.  A search of the bedroom resulted

---

[1]      All further references to code sections are to the Welfare and Institutions Code.

in the seizure of syringes and a methamphetamine pipe. The parents were arrested for child endangerment.

The children were ordered detained and placed in foster care and both parents pled no contest to dependency jurisdiction under subdivision (b) of section 300. The court sustained allegations that Mother had a 16-year history of substance abuse, which had resulted in five older siblings with other fathers being permanently removed, and she was a current abuser of methamphetamine which rendered her periodically incapable of providing regular care of the children. Jurisdiction was sustained as to Father on the ground that he had a history of substance abuse, was a current abuser of illicit drugs, and on occasion was under the influence of illicit drugs while the children were in his care.

At the dispositional and jurisdictional hearing held on December 11, 2012, monitored visits were ordered for Mother and Father, three times a week for three hours per visit. The parents were ordered not to visit at the same time. Family reunification services were not ordered for Mother, pursuant to section 361.5, subdivisions (b)(10), (11), and (12), based on her failure to reunify and the termination of her parental rights with respect to her older children, and based on her continued drug use.[2] However, family reunification services were ordered as to Father. Father was ordered to attend parenting counseling, Alcoholics Anonymous or Narcotics Anonymous meetings, and alcohol and drug counseling, and was ordered to submit to random alcohol and drug testing one time each week. The case plan filed on the date of the hearing noted the required drug and alcohol program, weekly drug testing, parenting programs, and monitored visitation. The court set a six-month review hearing for June 11, 2013.

---

[2] Mother is not a party to this appeal.

3

*Father's Progress Under Case Plan*

On December 14, 2012, a caseworker interviewed Father over the phone. Father was friendly and cooperative but was often interrupted by Mother, who could be heard in the background responding to questions for him. Father was not able to answer specific questions regarding his children's daily care, but rather gave very vague and generalized answers.

Father was provided with referrals to various programs on December 7, 2012, but did not make use of them for three months, instead stating that he wanted a program in Long Beach and wanted to participate in a program that would allow him to live with Mother. On January 3, 2013, Father reported that he and Mother were wait-listed for a residential program that was willing to take them together. On March 6, 2013, with an April 2013 criminal court date approaching at which he was supposed to demonstrate that he was enrolled in parenting classes, Father enrolled at the Substance Abuse Foundation. Mother did not enroll in any treatment plan.

The first scheduled visit was January 2, 2013, which Father missed, but he then visited the children on January 10, 15, 29, 31 and February 5, 7, 19, 21, 27 and 28, 2013, usually arriving at the visits with Mother and each of them separately visiting the children for two hours. Father missed a total of three visits in February and early March 2013, each time failing to make it to the foster agency on time. At a visit in early February 2013, Father briefly fell asleep while holding the sleeping baby on the couch. He apologized and told the monitor that he was "so tired"; when Mother entered the room to get something he told her he wanted to end his visit early, and she stated she knew he was tired because he had been at the hospital all night because Mother's oldest daughter had had a baby. At another visit in February, Father had a hard time dealing with both children by himself during the visit at the foster agency, and dozed off for a few minutes during the

4

visit with the monitor present. When he switched off with Mother at that visit he told her that he had had a rough time, that both kids wanted his attention, and that he and Mother needed to return to court to request that they be permitted to visit the children together. At a subsequent visit in February, he again told Mother that it was too stressful for him to visit with the children by himself, and stated that he was going to call the caseworker the next day. The caseworker reported that on more than one occasion, Father asked if he and Mother could visit the children together, because Mother had been the primary caretaker and "this feeding and changing of the diapers is too much."

In these early visits, apparently following Mother's lead, Father fed Audrey hard snacks not suitable for an infant, and fed both children unhealthy and sugary snacks and drinks. At a medical examination following Audrey's detention, it was discovered that Audrey had high blood sugar levels, and the physician recommended that her sugar intake be limited. In addition, a letter from K.'s physician dated February 21, 2013 was provided to Father and Mother stating that K. should be eating baby food and formula, and not table foods or regular milk, juices or soda.

Father enrolled in a residential treatment program on March 6, 2013. It does not appear that visits with the children were scheduled for the first six weeks of his treatment. From April 16 through July 11, 2013, however, Father visited with the children two or three times a week, for two hours each time, and never missed a visit, except for one occasion when he had a doctor's appointment. Mother was not present at these visits.

The monitor's report from visits in April and early May 2013 demonstrates that Father behaved appropriately during the visits, was nurturing and affectionate with the girls and provided appropriate supervision, and complied with the plan for healthy eating. Although he struggled at times with dividing his attention with the

girls given their different needs, he was "learning to multitask, i.e. he spoon fed K. while reading a book to Audrey." "He readily tended to their needs," including changing their diapers and keeping them clean. Except for one visit on May 9, 2013, when Audrey appeared anxious and upset and kept a distance from Father, both girls engaged with him and appeared comfortable in his presence. Father's appearance had improved, and his demeanor was energetic and content throughout the visits.

The monitor's report for the visits from mid-May 2013 to mid-July 2013 reported that Father continued to arrive on time, behave appropriately, and be nurturing and affectionate with the children. Audrey no longer reacted with anxiety and was happy to see Father. At a July 2, 2013 visit, Father brought healthy snacks for Audrey such as fresh fruit, sugar free cookies, and yogurt. He did not set limits on how much fruit Audrey could eat, but when the monitor suggested he put away the bowl of fruit, he quickly complied and engaged Audrey in an activity. On July 11, 2013, he brought a "Lunchables" pizza snack for Audrey. When the monitor pointed out that the snack had too much sugar, he readily put it away. Although the visits went well, the foster parents reported that afterwards Audrey would cry a lot, be clingier than normal, and have excessive tantrums.

Father was not drug-tested prior to his enrollment in residential treatment. His first drug test on the date he entered the treatment facility, March 6, 2013, was positive for THC and methamphetamines. However, Father subsequently tested negative for drugs each week through the last test on record, in early July 2013.[3]

---

[3]   DCFS notes that Father did not drug-test at DCFS headquarters on April 4, April 17, May 10, and May 29, 2013 but he was drug-testing at his residential facility during that time period.

While enrolled in the residential treatment program, Father attended 16 out of 16 parenting classes and also attended individual counseling, classes on anger management, self-esteem, drug and alcohol education, and relapse prevention, 12 step meetings, as well as parenting, life skills, feelings, boundaries, family, and "commitment to change" groups.

*Six-Month Review Hearing on July 24, 2013*

A. *DCFS Recommendations*

In advance of the six-month review hearing, DCFS filed an interim review report noting that the visits between Father and the children were going well and no concerns were indicated, except that it was noted that the monitor sometimes still had to stop Father from overfeeding the children, that sometimes he was unaware of the sugar content of foods he offered Audrey, and the foster mother was still reporting that Audrey was very clingy before and after the visits with her Father, was still having tantrums, and needed therapy after the visits. DCFS noted Father's negative drug tests since he enrolled in drug treatment and his consistent participation in counseling and groups.

Despite Father's negative drug tests and consistent visits and attendance at counseling, DCFS recommended that the court set a section 366.26 hearing in 120 days and terminate Father's reunification services, rather than continue services for Father until a 12-month hearing. DCFS expressed concern that Father did not enroll in a treatment program until soon before his April 2013 criminal court date, where he would have to show proof of enrollment in parenting classes.

Moreover, DCFS noted that it had concerns about Father's relationship with Mother and about whether he would protect the children from her. He tried to cover up the fact that she was incarcerated on April 26, 2013 for transporting controlled substances, made excuses for her failure to attend visits with the

7

children, and did not seem to recognize her failure to undergo treatment for her drug addiction. As recently as June 6, 2013, Father had informed DCFS caseworkers that he planned to get his children, wait until the case closed, and then he and Mother would get back together and care for the children together. He also had stated on numerous occasions that he had never cared for the children alone and would like the visits to be combined with Mother's so that she could help him with changing diapers and feeding the children. DCFS had first raised the issue of Father's continued involvement with Mother in its June 11, 2013 status review report, which indicated that Father stated that he would like to raise the children as a family with Mother, but if DCFS or the court did not think that Mother could be part of the family, Mother had agreed to stay out and let Father raise the children.

Finally, DCFS opined that Father did not understand that the children had medical problems (K. had preliminarily been diagnosed with fetal alcohol syndrome and was receiving occupational therapy for "emerging" fine motor functioning, and Audrey had sugar level issues and somewhat delayed speech) and needed to follow a specific diet. On the other hand, the foster family was dedicated to closely following the nutritional plan for the children and addressing their special needs, and had indicated they would be prepared to adopt the children if family reunification services were terminated.

B. *Father's Testimony*

Father testified at the hearing that he was still enrolled in his residential treatment program and was continuing to participate in all its programs and submit to drug tests. He had realized that he had a serious drug problem, but he had learned to deal with it, and had learned ways to live better for his children and himself and to be a better father. He indicated that he had a sponsor with whom he met two or three times a week, and he attended AA/NA meetings three or four

8

times a week. He further indicated that currently he was the assistant sober living manager at the treatment facility, which he expected would soon become a paid position with on-site housing and free childcare.

Father testified that his plan was to get his children back and that he was able to care for the children himself. With respect to the reports by DCFS that Father was telling the social workers that he planned to reunify with Mother, Father testified that "[i]f the mother decides to better herself or to go into a program which will benefit her, I would consider it if the court will consider it. But right now, it's just me and my children." Asked if he had planned to move out of state with the children, possibly with Mother, he stated that he had considered it, so long as Mother was able to get reunification, but it was no longer part of his plan, given the change in circumstances due to his job offer at the treatment program. He indicated that he no longer wanted to return to Mother.

### C. *Foster Mother's Testimony*

The foster mother, Candice V., testified that on multiple occasions, and as recently as June 6 or June 11, 2013, Father stated that he wanted to be a family unit with Mother. She also testified that until March 2013, Mother and Father would arrive at and leave visits together. She further indicated that in February and March 2013, Father told her that he needed Mother to help care for the kids, but he had not made such statements recently.

### D. *Dependency Court's Ruling*

The court found that Father had made exemplary progress in his case plan, stating, "As to Father's participation, I don't think I've seen anybody who has participated as regularly or much as he has." The court indicated that it counted 30 negative tests in a row from his program, and stated, "I almost never have anybody

9

that does that well. . . . I disagree with County Counsel that he hasn't tried. I agree that he's tried." Although the court expressed some concern that Father could relapse, as he admitted he had done so on at least one occasion in the past, the court believed Father was "working his way towards sobriety." The court stated, "I've never seen anybody do as well as he's done in his programs. I'm very impressed with how he's done. I'm impressed with the sponsorship. I'm impressed with him getting a job [at the treatment facility] and apparently even a management role there."

However, the court concluded that Father had not clearly indicated that he was going to sever his relationship with Mother, who still posed a risk to the children because her drug habits had not been alleviated. Although Father stated in court that his priority was getting the children back and that he no longer planned to reunify with Mother, the court expressed concern that it was difficult to verify whether Father truly intended to discontinue his relationship with Mother.

The court thus found Father to be in partial compliance with the case plan. The court found that there existed no substantial probability that the children may be returned to Father within six months, and ordered family reunification services for Father to be terminated. Pursuant to section 366.21, subdivision (e), the court set a section 366.26 permanency hearing for 120 days later, on November 19, 2013. Monitored visitation for Father for four hours per week was continued.

Father filed a timely notice of intent to file a writ petition.

## DISCUSSION

*Statutory Framework*

Section 361.5, subdivision (a), and section 366.21, subdivision (e), set forth special procedures for dependency cases involving children who are age three or younger when they first enter foster care. For such young children, family

10

reunification services are provided to eligible parents or guardians "for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care[4] as provided in Section 361.49." (§ 361.5, subd. (a)(1)(B).)[5] Section 361.5, subdivision (a)(3) further provides that "[i]n cases where the child was under three years of age on the date of the initial removal from the physical custody of his or her parent or guardian . . . , the court shall inform the parent or guardian that the failure of the parent or guardian to participate regularly in any court-ordered treatment programs or to cooperate or avail himself or herself of services provided as part of the child welfare services case plan may result in a termination of efforts to reunify the family after six months."

At the six-month review hearing, if the juvenile court finds it cannot return the child to the parents because of a substantial risk of detriment to the child, section 366.21, subdivision (e) provides, in relevant part: "If the child was under three years of age on the date of the initial removal, . . . and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to his or her parent or legal guardian within six months . . . , the court shall continue the case to the 12–month permanency hearing."

---

[4]     Pursuant to section 361.49, Audrey and K. are deemed to have entered foster care on December 11, 2012.

[5]     At the 12-month review hearing, the court has discretion to extend reunification services up to a maximum of 18 months from the date of the child's removal if there is a substantial probability the child will be returned to the parent before the 18-month period ends, or the services offered to the parent were unreasonable. (§ 361.5, subd. (a)(3).)

11

"Thus, there are two distinct determinations to be made by trial courts applying the third paragraph of section 366.21, subdivision (e). First, the statute identifies specific factual findings—failure to participate regularly and make substantive progress in the court-ordered treatment plan—that, if found by clear and convincing evidence, would justify the court in scheduling a [section 366].26 hearing to terminate parental rights. . . . [¶] The second determination called for by the third paragraph of section 366.21, subdivision (e), protects parents and guardians against premature [section 366].26 hearings. Notwithstanding any findings made pursuant to the first determination, the court shall not set a [section 366].26 hearing if it finds either (1) 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or (2) 'reasonable services have not been provided . . .' to the parent. (§ 366.21, subd. (e).) In other words, the court must continue the case to the 12-month review if it makes either of these findings." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175-176 (*M.V.*), italics omitted; see also *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 613 (*Daria D.*) ["[T]he court may not schedule a section 366.26 selection and implementation hearing at the six-month stage unless it finds by clear and convincing evidence the parents failed to regularly participate in reunification services. Even absent compliance, however, the court must continue the case if it finds 'a substantial probability that the minor . . . may be returned to his or her parent . . . within six months or that reasonable services have not been provided[.]'"].) Stated conversely, a court may set a section 366.26 hearing and discontinue reunification services after the six-month review hearing only if it finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in his or her court-ordered treatment plan, and even if the parent failed to make sufficient progress by that juncture, the court may discontinue services only if there was not a substantial probability that the

12

child may be returned to the parent within six months and only if reasonable services were provided to the parent. (§ 366.21, subd. (e).) If the child is not returned and the court does not set a section 366.26 hearing, the court must order that any reunification services previously ordered will continue to be offered to the parent or legal guardian. (*S.T. v. Superior Court* (2009) 177 Cal.App.4th 1009, 1016; Cal. Rules of Court, rule 5.710(b)(4).)

We note that in *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845, which addressed how to measure the six-month period between the first and second review hearings, the Supreme Court stated that during the period from the six-month hearing to the 12–month review hearing, "a heightened showing is required to continue services. So long as reasonable services have in fact been provided, the juvenile court must find 'a substantial probability' that the child may be safely returned to the parent within six months in order to continue services. (§ 366.21, subd. (e).)" The Supreme Court thus suggested that a finding of substantial probability of return was required at the six-month hearing in order to continue services, and did not refer to the circumstance where a parent had made substantial progress in his or her treatment plan but it was not substantially probable that the child may be returned by the 12-month hearing.

However, at the time of that Supreme Court decision, section 361.5 provided for a maximum of six months of services to parents of children removed when they were under three years old, unless there was a substantial probability the child would be returned to the parent's custody (former § 361.5, subd. (a)(2); see *In re Jesse W.* (2007) 157 Cal.App.4th 49, 62-63 [also applying prior version of section 361.5, subdivision (a)(2) and noting that the provision limited the provision for continued services found in section 366.21, subdivision (e)]). We conclude that under the current, applicable statute, which provided for services "for a period of six months . . . but no longer than 12 months" (§ 361.5, subd. (a)(1)(B); Stats.

2012, ch. 35, § 48), the showing of a substantial probability of return is a necessary condition only for continuing services at the 12-month hearing (§ 361.5, subd. (a)(3)), but at the six-month hearing services may be continued where (1) the parent has demonstrated a substantial probability that the child may be returned within six months; (2) reasonable services were not provided; or (3) the parent has regularly participated and made substantial progress in his or her treatment plan.

This construction of the statutory scheme not only is dictated by the plain language of the statute, but it is consistent with the Legislature's stated purpose in permitting early termination of reunification services for children removed at a very young age: "to provide more timely resolutions for very young children in cases '"with a poor prognosis for family reunification, (e.g., chronic substance abuse, multiple previous removals, abandonment, and chronic history of mental illness),"' *without vitiating the strong interest in reunifying families or prematurely cutting off the rights of parents who are making substantial efforts to reunify. . . .* '[S]ervices may be terminated at the six-month stage only when "parental unfitness is so well established that there is no longer 'reason to believe that [a] positive, nurturing parent-child relationship[ ] exist[s]' [citation], and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished."'" (*M.V., supra*, 167 Cal.App.4th at pp. 182-183, italics added, quoting *Daria D., supra,* 61 Cal.App.4th at p. 613.) Sections 361.5, subdivision (a)(1)(B) and 366.21, subdivision (e) "merely provide the court with the option to terminate reunification efforts after six months where the parents have made little or no progress in their service plans and the prognosis for overcoming the problems leading to the child's dependency is bleak." (*Daria D., supra,* 61 Cal.App.4th at p. 612.)

We review findings made under section 366.21 for substantial evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) "We do not pass

14

on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) This standard of review applies even where the juvenile court was required to base its determination on the heightened "clear and convincing" standard of proof. (See *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880–881.)

*Father's Progress in Treatment Plan*

Father contends that substantial evidence did not support the determination that he failed to participate regularly and make substantive progress in his court-ordered treatment plan. We agree.

Father's court-ordered case plan required that he participate in parenting counseling, Alcoholics Anonymous or Narcotics Anonymous meetings, and alcohol and drug counseling, and to submit to random alcohol and drug testing one time each week. Further, Father was ordered to participate in monitored visitation with the children.[6]

The undisputed evidence demonstrated that once Father entered treatment he had perfect attendance at his parenting classes, participated in substantial group and individual counseling relating to substance abuse, and attended multiple NA meetings each week. With respect to visitation, although Father's attendance was somewhat sporadic before he entered his treatment program in early March 2013,

---

[6] The court ordered that Father's visits be separate from Mother's, although that requirement was not included in the case plan.

the record demonstrates that he missed only one visit, for a doctor's appointment, from the period from April through early July 2013. The monitor reported that he was appropriate, nurturing, and affectionate during these visits. Moreover, his visits qualitatively improved over time, as he evolved from struggling in January and February 2013 to provide care simultaneously to both young children on his own, to being able to multi-task in order to meet both children's needs by July 2013. He also became more educated about, and learned to comply with, the children's nutritional requirements over the course of the visits.

The court indicated that it would agree that Father was entitled to more services based on his progress if it focused only on Father's participation in reunification services. The court made note of Father's 30 consecutive negative drug tests since he entered a residential treatment program in March 2013, and indicated its belief that Father was "working his way towards sobriety." The court further stated that it had "never seen anybody do as well as he's done in his programs."

The court nevertheless decided to set a section 366.26 hearing and to terminate reunification services, based on its understanding that Father was required to demonstrate at that six-month juncture a substantial likelihood that he could get the children back, and its conclusion that Father could not do so because he had not clearly demonstrated an intent to sever his relationship with Mother, who had not been successful in overcoming her drug problem.

As discussed above, if Father participated regularly and made substantive progress in his court-ordered treatment plan, the court did not have discretion under section 366.21 to schedule a section 366.26 hearing within 120 days of the six-month review hearing and to terminate reunification services. (§ 366.21, subd. (e); *M.V., supra,* 167 Cal.App.4th at pp. 175-176.) Neither the case plan (nor any court order for that matter) required Father to sever his relationship with Mother as

16

a condition for continuing reunification services until a 12-month hearing, and there is no evidence in the record that Father was even counseled as such until just before the review hearing. Father thus cannot be found to have failed to make progress under that case plan by failing to end the relationship. With that issue removed from consideration in deciding whether early termination of services was warranted, and given the court's own findings and the undisputed evidence in the record regarding Father's exemplary progress, substantial evidence did not support the finding that Father did not regularly participate and make substantive progress in his court-ordered treatment plan.

Respondent argues that under cases such as *In re Joseph B.* (1996) 42 Cal.App.4th 890 (*Joseph B.*), compliance with the treatment plan is only one factor to be considered, and such compliance does not guarantee return of the child where other issues, such as Father's continued relationship with Mother, remain unresolved. In *Joseph B., supra*, 42 Cal.App.4th 890, the court held that "the question whether to return a dependent child to parental custody is not governed solely by whether the parent has corrected the problem which required court intervention; rather, the court must consider the effect such return would have on the child. If returning the child will create a substantial risk of detriment to his or her physical or emotional well-being (§§ 366.21, subds. (e) & (f), 366.22, subd. (a)), placement must continue regardless of whether the detriment mirrors the harm which had required the child's removal from parental custody (§§ 300, subds. (a)-(j), 361, subd. (b))." (*Id.* at p. 894.) However, as Father points out, *Joseph B.* concerned the issue of whether the minors should be *returned to their parents' custody*, a determination that rightly focuses on more than just the parents' compliance with the case plan. By contrast, the issue here is whether Father "failed to participate regularly and make substantive progress in a court-ordered treatment plan" (§ 366.21, subd. (e)), such that a section 366.26 hearing may be set

17

at the earliest possible point and reunification services discontinued because he is not making substantial efforts to reunify.  As discussed above, we conclude that substantial evidence does not support a determination that he failed to participate regularly and make substantive progress in his case plan, and thus the court erred in setting a section 366.26 hearing and terminating reunification services.[7]

Father has conceded that as of the six-month hearing, he had not ameliorated all the problems that led to the children's removal, including his relationship with Mother.  At the 12-month hearing, the court may appropriately focus on whether Father has gained insight into the risk that Mother's drug addiction poses to the children, and whether Father has sufficiently demonstrated that he has severed his relationship with Mother and intends to protect the children from her.

---

[7]     Because we find that Father was entitled to continued services until the 12-month hearing based on his regular participation and substantive progress in his treatment plan, we need not consider whether he alternatively could have qualified for continued services because there existed a substantial probability that the children may be returned to Father's custody by the 12-month hearing.

## DISPOSITION

Let a peremptory writ of mandate issue directing the juvenile court to vacate its July 24, 2013 order terminating reunification services and setting a section 366.26 permanency hearing and to issue a new order (1) continuing the case to the 12–month review hearing under section 366.22, subdivision (f) and (2) reinstating family reunification services until the date of that hearing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




SUZUKAWA, J.

19