Filed 2/14/14  Michael J. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL J., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF MONTEREY <br><br> Respondent, <br><br> MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES, <br><br> Real Party in Interest. | No. H040336 <br> (Monterey County <br> Super. Ct. Nos. J46890, J46891, J46892, J46893) |

A.J., J.J., K.T., and S.M.T., minors all under the age of 10 (collectively, the minors), were placed in protective custody on November 14, 2012. Thereafter, the Monterey County Department of Social and Employment Services, real party in interest (Department), filed four petitions alleging the failure of the minors' mother, S.T. (Mother), and father, Michael J. (Father), to protect and provide support for their

children, under Welfare and Institutions Code section 300, subdivision (b).[1] It was alleged in each petition, inter alia, that (1) Mother had a longstanding substance abuse problem; (2) Mother has nine children[2] and a history with child protective services in three counties dating back to at least 1994; (3) two of the minors, A.J. (eight) and J.J. (eight), were caught stealing food at a store in Salinas on November 13, 2012; (4) when he was apprehended, A.J. explained that he was hungry and trying to get food for his younger siblings, and that Mother had sent him and his twin sister, J.J., out to steal food; (5) at the time A.J. was caught stealing, J.J. was found outside the store panhandling; (6) on November 14, 2012, a social worker paid a visit to the motel room where Mother and the minors were living and found the place "in a filthy state" with "trash all over the floor," "broken bowls with dried beans in them," a "toilet that was plugged to the top with feces," a plugged bathroom sink, and a refrigerator with no food. The Department further alleged that J.J. had said that she had been sexually abused more than once by an older half-brother, and she had told Mother about the abuse, but Mother did not report it. The Department also alleged that both Father and Mother were physically abusive to the minors, and that none of the minors was enrolled in school.

On January 30, 2013,[3] respondent superior court found the allegations true and sustained each petition. It ordered that family reunification services be provided to Mother and Father. Thereafter, two psychologists performed court-ordered evaluations of Mother and Father. After separate interviews and evaluations of each parent performed by each psychologist, both experts found the parents to be suffering from a mental capacity or disorder that rendered them unable to care for and control the minors,

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Although Department alleged at the time it filed the petitions that Mother has nine children, it later learned, as discussed, *post*, that Mother actually has 13 children.

[3] All dates hereafter stated are 2013 unless otherwise specified.

even with the provision of family services. Accordingly, both professionals recommended that reunification services for Mother and Father be terminated.

At the six-month review hearing held on October 30, the court ordered that the minors continue to be detained and remain in out-of-home care. In its October 30 order (Order), the court also set a selection and implementation hearing under section 366.26 (hereafter, sometimes referred to as a .26 hearing) for February 19, 2014, and terminated reunification services for Mother and Father. The Order contained a number of findings, including that each minor was a member of a sibling group, and that reasonable services had been provided or offered to the parents by the Department. The court also found, by clear and convincing evidence, that (1) Mother and Father had each failed to participate regularly and make substantive progress in a court-ordered treatment program; (2) there was not a substantial probability that the minors might be returned to their parents within six months; and (3) based upon the opinions of two mental health professionals, the parents suffered from a mental incapacity or disease that warranted termination of reunification services.

Petitioner Michael J. seeks a writ of mandate to compel respondent superior court to vacate its Order. He challenges the court's termination of his reunification services, contending that the court erred because (1) the order requiring Father to submit to psychological evaluations constituted a denial of his due process rights and an invasion of his privacy rights; (2) admission into evidence of the reports of the two psychologists was prejudicial error because it was not established that the professionals contained the qualifications required by law; and (3) the court did not cite a specific legal basis for denying reunification services in the Order.

We conclude that respondent court did not commit error in setting a selection and implementation hearing under section 366.26 and in terminating reunification services. For the reasons stated below, Father's first and third arguments are without merit. The

3

fact that the court admitted into evidence the two psychologists' reports without establishing their statutory qualifications was harmless error. The court's scheduling of a .26 hearing and the termination of Father's reunification services at the six-month review hearing was appropriate under section 366.21, subdivision (e) (section 366.21(e)). There was substantial evidence supporting the court's findings that (1) each of the four minors was the member of a sibling group; (2) Father had failed to participate regularly and make substantive progress in a court-ordered treatment plan; (3) there was not a substantial probability that the minors might be returned to Father within six months; and (4) reasonable services were provided to Father. It was therefore within the proper exercise of the court's discretion in ordering that a .26 hearing be scheduled within 120 days and in terminating reunification services. The court's additional finding concerning Father's suffering from a mental incapacity or disease was not a dispositive factor to the decision to terminate reunification services; thus any claimed error relative to that finding is harmless. Accordingly, we will deny the petition.

FACTS AND PROCEDURAL HISTORY

I.    *Initial November 2012 Petitions and Detention Orders*

On November 16, 2012, the Department filed four separate petitions alleging that the parents had failed to protect the minors. (§ 300, subd. (b).) The Department alleged,[4] inter alia, that Mother has nine children—three adults, two teenagers, and the four minors, A.J. (age 8), J.J. (age 8), K.T. (age 4), and S.M.T. (age 2), and that petitioner Michael J., is the father of the four minors.[5] Mother has a long-existing substance abuse

---

[4] The statements made in this paragraph and the succeeding four paragraphs are based upon the allegations made by the Department in its four petitions. For simplicity and to avoid repetition, we have generally omitted the phrase "The Department alleges in its petitions" in describing the allegations in the petitions.

[5] Subsequent to the filing of the petitions, Mother was evaluated separately by two psychologists. In the psychologists' reports, it was indicated that Mother had given birth to 13 children. Mother, in the interviews, identified, in addition to the nine children listed

4

problem and "has a very long history with child protective services in Sacramento, San Francisco, Merced[,] and Monterey counties dating back to[] at least 1994."[6] On November 13, 2012, officers with the Salinas Police Department reported that A.J. and J.J. were caught stealing from a grocery store. A.J. had told the police that he was hungry and was attempting to get food for his younger siblings. J.J. had been outside panhandling.

On November 14, 2012, a Department social worker visited the motel room where Mother and the minors were living. It "was in a filthy state. There was trash all over the floor, as well as broken bowls with dried beans in them. The toilet was plugged to the top with feces, and the bathroom sink was plugged with dirty water filled to the top. There was no food in the small refrigerator, [and] only 1/3 of a half-gallon carton of milk and one potato lying on the floor, which [M]other said she was going to cook in the microwave for their dinner." Mother denied that her twin children had been stealing and panhandling. She claimed that she had given money to them to buy food and said, "It's not my fault [A.J.] was stealing . . . Are you going to blame me for that?" The minors were placed in protective custody that day; they left without shoes or jackets because their clothing could not be found among the jumble of clothes on the floor.

J.J. and A.J. admitted to the social worker that Mother had sent them out to the grocery store to steal food and that she had done so on other occasions because they were hungry. A.J. reported that when they got to the store, he told his sister to wait for him outside because she was not serving her purpose. J.J. told the social worker that she was

_____

in the petitions, two teen-age sons and twin 11-year-old daughters, each of whom she is the noncustodial mother.

[6] The petitions described several previous referrals involving Mother and her children, including an "inconclusive referral" of neglect in August 2012 in which the Los Baños Police Department went into the home and determined that it was "filthy with a strong odor of feces, with trash overflowing from the garbage can, and the sink clogged with mold."

very proud that she had never been caught stealing because she could " 'run fast.' " J.J. said that she had been sexually abused by an older brother, she had told her Mother about the abuse, and that Mother " 'didn't like it,' but no report was made to the police."

J.J. and A.J. also reported that Father was physically abusive. "A.J. stated his [F]ather 'whips' all of the children, except [S.M.T.], with a belt." J.J. told the social worker that Father had struck A.J. with a closed fist in the back of the head and had made A.J.'s nose bleed. J.J. said that Mother also had struck her and K.T. for disciplinary reasons. J.J. also told the social worker that "[M]other takes 'morphine pills' and when she does not have them she has 'withdrawals' and she gets diarrhea, throws[] up[,] and sweats."

None of the minors was enrolled in school. The Department contacted Mother and invited her to participate in a meeting, but Mother declined, saying she was ill. Mother refused to tell the Department where her 17-year-old and 15-year-old sons were living.

On November 19, 2012, the court ordered the minors detained pursuant to section 319, subdivision (b). Neither Mother nor Father attended the hearing.

II.     *Family Assessment Reports*

Two family assessment reports were prepared at the Department's request by Catherine Donahue, Ph.D., a psychologist with the Monterey County Department of Mental Health. The January 3 and January 8 reports are discussed below.

A.     *January 3 Report*

In a January 3 report, Dr. Donahue reported on Mother's failure to keep appointments concerning her participation in the family mental health assessment process; detailed four family visits between Mother and the minors, indicating that Mother's "behavior was inappropriate, abusive, erratic and disrespectful toward her children"; described that Mother had been verbally abusive with the social worker during

one of the visits; and indicated that J.J. and A.J. had reported they had been physically abused by Mother, and had frequently observed Mother using illegal drugs.[7]

### B.     *January 8 Report*

Dr. Donahue prepared and submitted a more comprehensive family assessment report dated January 8. She included a detailed review of her interview and evaluation of Father. Dr. Donahue noted that Father denied ever having physically abused the minors. He also denied ever having sexually abused J.J. Dr. Donahue observed that Father had given conflicting answers concerning his failure to ever attempt to gain custody of the minors, notwithstanding Mother's demonstrated inability to care for them. Dr. Donahue noted the inconsistency in Father's statement that he had been the minors' full-time caregiver, while otherwise indicating that he had worked full-time until being attacked in May 2012. Further, she observed that Father had "permitted his children to remain in [Mother's] care despite her history of prior involvement with CPS, substance abuse history and alleged absences . . . [and] failed to intervene or ascertain [*sic*] the assistance of authorities or medical personnel when [Mother] was using substances during all four of the pregnancies." Because of "[Father's] concerning, pervasive interpersonal style where problems were focused outward and blame placed on others, exhibiting little insight into his present life difficulties, and gross lack of judgment with the children," Dr. Donahue "strongly recommended that [Father] participate in a Court-Ordered Psychological Evaluation."

Dr. Donahue's January 8 report also detailed her interviews, testing and evaluations of each of the four minors. Dr. Donahue described A.J. during her two interviews of him as having been "severely anxious." He repeatedly expressed fears that Mother would " 'steal [him] from [his] foster home.' " He repeated to Dr. Donahue the

---

[7] On January 16, based upon Dr. Donahue's recommendation in her January 3, assessment report, the court issued an order requiring a psychological evaluation of Mother.

claims made to the social worker about Mother's substance abuse and her physical abuse of the minors. He also said that Father physically abused him and that he had "witness[ed] severe violence in the family home. He said, 'Dad hits me. He punched me in the face and kicked me. My brother tried to kill my Dad with a hammer. Mom told my brother to kill Dad.'" A.J. described to Dr. Donahue his "parentified role in the family system. In addition to securing food for his siblings, [A.J.] was responsible for cleaning the family home" and changing his baby sister's diapers. He indicated that Mother depended on him to do the cleaning, but that he could not "keep up with the 'mess' generated by his siblings." Dr. Donahue concluded that A.J. "presents with a significant trauma history, symptoms of anxiety, poor self-esteem, physical abuse, exposure to maternal substance use, and exposure to severe domestic violence. Although [A.J.] does not meet diagnostic criteria of Posttraumatic Stress Disorder (PTSD) at this time, his symptoms should be monitored by his treating clinician."

Dr. Donahue described J.J. as "demonstrat[ing] indiscriminate boundaries: she attempted to hug this examiner and stayed physically close to this examiner." She was "anxious," "spoke loudly and rapidly," and "[h]er ability to initiate and sustain attention was significantly impaired." J.J. told Dr. Donohue: " 'Mom hits me and [K.T.] and [A.J.]' with a brush, belt, '[she] cut me, punched me with [a] fist in [the] face.' . . . [Mother] throws 'kids against the wall. Across the room.' [J.J.] stated that [Mother's] physical limitations prevent her from getting 'off the couch . . . [A.J.] chases us. She makes him chase us. Then Mom beats us with a brush or her fist.'" J.J. also said that on one occasion, Mother struck her on the head with a screwdriver. She said that Father also physically abused her. On one occasion, Father choked her and had his hand over her mouth. J.J. also said that Father "forced [A.J. to] swallow a penny, noting, '[A.J.] choked.'" In addition, J.J. told Dr. Donahue that her adult brother, M.T., had sexually assaulted her a number of times. J.J. reported the first sexual assault to Mother, "who

8

'was crying.' Yet, [J.J.] alleged that [Mother] failed to intervene to prevent further, sexual assaults."[8] J.J. also reported to Dr. Donahue that Father " 'pinched my private with his hands' " and gestured to her vagina.

Dr. Donahue concluded: "[J.J.] presents with significant symptoms of trauma and emotional dysregulation. Additionally, [J.J.] exhibits high needs for nurturance, a strong desire to connect with others, and indiscriminate boundaries. It should be noted that these poor, indiscriminate boundaries will place her at risk for being further exploited by others. These symptoms are consistent with chronic, and untreated, Posttraumatic Stress Disorder in children."

In her evaluation of K.T., Dr. Donahue observed that "[K.T.'s] vocabulary was limited"; "[h]is eye contact was sporadic"; "[h]e also demonstrated odd movements with his mouth . . . [that were] clearly linked to internal states of anxiety"; he "struggled to initiate and sustain attention"; he "exhibited impulsivity, poor frustration tolerance"; and "[o]n several occasions, [K.T.] became silly, dysregulated, and uttered obscenities . . ." His foster father reported that K.T. "tends to be physically aggressive with peers," is not yet toilet trained, struggles with brushing his teeth, and exposes himself to others in the foster home. Dr. Donahue also observed that K.T. was aggressive toward J.J. and A.J. at the family visitations. She concluded: "[K.T.] presents with significant emotional and behavioral dysregulation, hyperarousal, hyperactivity, impulsivity and inattention. . . . It is important to note that chronic exposure to substance use, domestic violence, and being the victim of physical abuse, can contribute to severe dysregulation and symptoms of hyperactivity, impulsivity and inattention. Additionally, his difficulties with social cognition and social communication might be artifacts of his trauma history." She noted that K.T.'s difficulties might be the result of Mother's substance abuse while K.T. was in

---

[8] Dr. Donahue indicated in her report that "[J.J.] revealed the sexual abuse to Mr. [T.,] who was crying. . ." Given that Mother and Father have different surnames and also given the succeeding sentence, it is clear that "Mr." is a typographical error.

utero. Dr. Donahue recommended that K.T. be evaluated further "to rule out the presence of Autism Spectrum Disorder."

Dr. Donahue also evaluated two-year-old S.M.T. She found that throughout the interview, S.M.T. "demonstrated minimal regard for this examiner, and exhibited a flat affect and restricted range of facial expressions. She exhibited poor eye contact, rarely directed her facial expressions toward this examiner, and did not respond to her name on several presses. She also failed to follow one-step directions." Dr. Donahue noted that S.M.T. was "largely mute" during the session, uttered only "a few vowel sounds," and "presented as aloof, exhibit[ing] little interest in her surroundings, and seem[ing] drawn to only a few select toys." She observed that "[S.M.T.'s] communication, gross motor, fine motor, problem-solving and personal social skills were well below the clinical cutoff, and these are areas that are in need of intervention." She concluded: "[S.M.T.] presents with a history of physical abuse, exposure to severe violence in the home, exposure to maternal substance use, neglect and separation from her mother. . . . [S.M.T.] demonstrated significant developmental delays, and there is a suspicion of prenatal substance exposure." She recommended evaluations to rule out speech-language disorder, hearing difficulties, visual impairments, and fine motor delays. Dr. Donahue also recommended that S.M.T. be evaluated further to "rule out the presence of Autism Spectrum Disorder."

Dr. Donahue supplied her clinical evaluation of family functioning. She concluded that "[Mother's] erratic behavior creates an atmosphere of danger and unpredictability in the home, and communicates that her needs supersede the needs of all other family members. Thus, family members are constantly in a hypervigilant state in order to anticipate, and likely escape from, the next incident of violence." Dr. Donahue also found that, based upon Father's "blatantly inaccurate reports of the children's development, and the fact that there is no evidence that he sought custody of the children

prior to [their detention]," it is likely that Father was emotionally and physically absent, and that his claims of involvement in the minors' daily care were false. She also noted that Father failed to protect the minors from Mother's violence, substance abuse, and erratic behavior. And she concluded, based upon the expression by J.J. and A.J. of fear toward Father, A.J.'s anxiety, and "[J.J.'s] severe symptoms of Posttraumatic Stress Disorder, it is unlikely that they are fabricating the reports of abuse by [Mother] and [Father]."

Dr. Donahue recommended that Mother be ordered to submit to psychological evaluation, and that her visitation of the minors, pending that evaluation, be suspended. Likewise, Dr. Donahue recommended that Father be ordered to submit to psychological evaluation, based upon his "concerning, pervasive interpersonal style where problems were focused outward and blame placed on others, [his] exhibiting little insight into his present life difficulties, and [his] gross lack of judgment with the children." She also recommended that Father have no contact with J.J. and A.J., based upon the report of child abuse, the twins' expressed fear of Father, and the fact that they declined visits with him. Dr. Donahue recommended that Father be allowed weekly, supervised visits of K.T. and S.M.T.

III.     *Report and Jurisdictional and Dispositional Hearing*

In its January 25 jurisdiction/disposition report, the Department repeated the allegations concerning the parents found in the initial petitions, including additional details concerning Mother's lengthy child protective service history, and the parents' respective criminal arrest and conviction histories. It noted that Mother's history with child protective services in Sacramento, San Francisco, Merced, and Monterey Counties dated back to at least 1994, and that during her Sacramento case involving her now-adult son, Mother and the child's father had failed to reunify with him because of their substance abuse, because the parents' whereabouts were then unknown, and because of

11

the father's status as a registered sex offender. The Department also alleged that since 2001 there had been eight referrals to child protective services for Mother and the minors. The Department social worker submitting the report noted that she had relied heavily on Dr. Donahue's family assessment report of January 8 (discussed, *ante*).

The Department noted that Father had indicated a willingness to retain custody of the minors. The Department recommended that the minors remain in out-of-home care as result of Mother's inability to provide adequate food and shelter, her untreated substance abuse, her unwillingness and inability to protect the minors from Father's physical abuse, and her failure to protect J.J. from sexual abuse. It further recommended that the court order Father to participate in a psychological evaluation.[9] The Department also recommended that Mother and Father be offered family reunification services, pending the results of each parent's psychological evaluation.

On January 30, after a jurisdictional and dispositional hearing attended by Mother and Father, the court found the allegations in the petition true and sustained the petition. The court declared each of the minors a dependent child of the juvenile court. It ordered further that the minors would not be placed with Father, the noncustodial parent; placement and care of the minors be vested with the Department; family reunification services be provided to Mother and Father, pending the results of psychological evaluations for both; no visitation of the minors be provided to Mother; no visitation of J.J. and A.J. be provided to Father; visitation of K.T. and S.M.T. be provided to Father; and July 17 was the likely permanency date. The court also ordered that Father submit to a psychological evaluation.

---

[9] The social worker noted in the report that Father indicated "he is willing to participate in any services that are required to have his children returned to his care."

IV.    *Six-Month Review Hearing and Challenged Order*

A.    *Background*

Pursuant to section 366.21(e), a six-month review hearing, originally set for July 17, took place on November 16. The Department, the minors, Mother, and Father were all represented by counsel, and Father was also present. The court received and considered evidence (discussed below), which consisted of two psychological evaluations by separate clinical psychologists concerning Mother; two psychological evaluations by separate clinical psychologists concerning Father; the Department's June 27 report and a September 19 addendum; a visitation evaluation related to Father's supervised visits of two of the minors (K.T. and S.M.T.); and the testimony of three witnesses.[10]

B.    *Psychological Evaluations of Mother*

On March 25, a psychological evaluation of Mother was performed by Elizabeth Lee, Psy.D.,[11] a licensed clinical psychologist.  In her report, Dr. Lee reviewed in detail Mother's personal history, her criminal history, her history with child protective services, background concerning the minors and the circumstances resulting in the proceedings, the substance of her interview with Mother, and the results of psychological testing.

Dr. Lee recommended that Mother not be offered reunification services because "[s]he will not be able to benefit from services within the time allowed by law[, and e]ven if [Mother were] given additional time from this court in order to participate in

---

[10] The court noted that it also considered the trial briefs submitted on behalf of the Department and Father, and the January 8 family assessment of Dr. Donahue (discussed, *ante*).

[11] Our indication that the two psychologists who evaluated Mother and Father possessed doctoral degrees is based solely on the fact that Dr. Lee's report contains a "Psy.D." designation after her name and Dr. Finnberg's report contains a "Ph.D." designation after her name.  As we discuss, *post*, there was no admissible evidence presented concerning the psychologists' respective qualifications.

13

services, she would not be able to do so."[12]  Dr. Lee concluded:  "[Mother's] complete denial that she has any problems coupled with her tendency to avoid self-examination means that she would be unlikely to attend, much less benefit from, either drug treatment or therapy.  If the children were returned to her care, they would likely be exposed to more domestic violence, substance abuse and neglect, and would be taught how to steal food and other goods."

A second licensed clinical psychologist, Elaine Finnberg, Ph.D.,[13] interviewed and evaluated Mother on May 14.[14]  Based upon her evaluation, Dr. Finnberg similarly recommended that Mother not be offered reunification services, concluding:  "Due to the fragility of her children and the severity of [Mother's] personality disorder characteristics, in my opinion there are no reunification [services] that could be offered to her from which she could receive benefit within the time allotted by law to return her children to her care."

---

[12] The language used by both Dr. Lee and Dr. Finnberg in their respective evaluations of both Mother and Father—i.e., the experts' recommendations that both Father and Mother not be *offered* reunification services—is technically inaccurate.  As noted, *ante*, the court ordered at the January 30 jurisdictional and dispositional hearing that Mother and receive family reunification services, pending the results of their psychological evaluations.  Indeed, Mother and Father each received reunification services for more than six months.

[13] See footnote 11, *ante*.

[14] At the three-month review hearing on April 17, the court granted a request that Mother and Father receive second psychological evaluations.  A reporter's transcript of this hearing is not part of the record; accordingly, this court has no further information concerning the April 17 order.

C.    *Psychological Evaluations of Father*[15]

1.    *Dr. Lee's Evaluation*

On February 18, Dr. Lee performed a psychological evaluation of Father. During the interview, Father denied a history of alcohol and cocaine abuse until he was confronted by Dr. Lee with contrary information, at which point "[h]e described a long history of cocaine abuse that was severe enough that he repeatedly violated his parole." He indicated that he had been clean and sober for one year and advised that he had voluntarily begun participating in an outpatient substance abuse clinic in Los Baños after his children were detained. Dr. Lee reviewed Father's criminal history with him; he "was very angry that [Dr. Lee] had been provided with a copy of his criminal records." Those records showed that Father had been convicted when he was in his early 20s for a charge arising out of a bar fight. He was arrested and convicted when he was 25 for the theft of a necklace he said was worth $10,000. When he was 28, he was arrested and received a short prison sentence arising out of his delivery of narcotics. Thereafter, he twice violated the terms of his probation. In or about 1997, he was arrested and convicted for the sale of cocaine and given a nine-year prison sentence; he served six years in prison and thereafter twice violated the terms of his parole. In 2009, he was arrested for felony assault upon Mother. He denied to Dr. Lee that he had assaulted Mother and explained that he accepted a plea bargain that involved his pleading guilty to a misdemeanor and receiving credit for the three months he served in jail.

Dr. Lee observed that Father "frequently contradicted himself. He initially tried to present an unrealistically positive façade of himself, and became irritable when he was asked about discrepancies between his self report and the CPS records." She found that Father "was not believable in his assertions that he [had] never physically abused his

---

[15] Similar to the psychologists' reports concerning Mother, Dr. Lee's and Dr. Finnberg's reports regarding Father contained recitals of Father's and the minors' background, and the circumstances leading to the minors' detention.

children and he has only been the victim of domestic violence. Throughout the interview, he appeared to only admit to things that [Dr. Lee] was aware of. In addition to this, his statements were contradicted by the statements of his family members and the conclusions of Family Assessment. . . .[¶ Father] tended to externalize blame. He did not take responsibility for the state in which his children were living or the fact that they were not attending school. He said that he complained to [Mother] about her drug and alcohol abuse, but he did not seem to feel that it was his responsibility to protect the children from it."

As a result of her interview and evaluation, Dr. Lee diagnosed Father as having a cocaine dependency, a personality disorder not otherwise specified with narcissistic and antisocial features, a history of brain trauma, and severe impairment in interpersonal functioning. She concluded that "[Father] is unlikely to benefit from therapeutic intervention. He has a strong need to not admit genuine personal problems to himself. Even if he participates in treatment, he is likely to continue to misrepresent his problem areas and to leave treatment prematurely." Dr. Lee concluded further: "The first step to changing behavior is acknowledging that there is a problem. In the case of [Father's] drug abuse and domestic violence, he is quite content to lie about his history if he thinks he can get away with it. Even when confronted with the records of his history, he still denies culpability. Given that he has been through drug treatment before, it appears unlikely that further counseling or treatment is going to lead to positive change within the period of time provided by statute." Dr. Lee therefore recommended that Father not be offered reunification services.

### 2.     *Dr. Finnberg's Evaluation*

Dr. Finnberg performed an interview and evaluation of Father on May 15. Dr. Finnberg referenced two supervised visits that Father had had with the two younger children, K.T. and S.M.T. She noted that "[Father] appears to over-excite [K.T.] to the

16

point that he cannot contain himself and during the initial visit ran out of the room looking for his caregiver. When he came back into the room, he pulled away from his father. . . . [S.M.T.] was aloof and distant although [Father] was attempting to engage the children in play."

In addition to reciting background information similar to that found in Dr. Lee's report, Dr. Finnberg noted that Father reported that he had been hospitalized for psychiatric treatment in Seattle, Washington in 1987. He explained that the mother of his oldest child had left him because of his drug and alcohol abuse, and he had become depressed and suicidal. He indicated that he had been hospitalized four times at the same Washington hospital, "twice for suicidal ideation, and twice because he was homeless" and in which he had fabricated mental problems to get off the streets. He told Dr. Finnberg that "he ha[d] been involved in domestic violence episodes with his first two wives and with [Mother]." He explained that he met [Mother] "in Seattle while he was on the street looking for drugs after being released from prison. They met and she came to his room to do drugs. After that they were 'pretty much together for nine years.' "

Father admitted to Dr. Finnberg that he had a history of drug and alcohol abuse. He also admitted that he had "physically abuse[d A.J.] and [J.J.], particularly [A.J.], and describe[d] himself as having been 'hard on him, spanking him.' " He also acknowledged that he had failed to protect the minors from Mother's abuse and neglect.

Among the testing that Dr. Finnberg conducted was one which, based upon the answers to 160 questions, showed Father to have a "high Abuse Scale score . . . An elevated Abuse Scale score indicates that he is reporting an array of personal and interpersonal characteristics that are similar to characteristics of known physical child abusers." Persons with high Abuse Scale scores also tend to be "moody, restless, self-centered, evasive of responsibility" "overreactive and irritable, . . . have low frustration tolerance, [and] poor impulse control."

17

Dr. Finnberg diagnosed Father as having a "Mood Disorder Not Otherwise Specified"; "Polysubstance Dependence in partial remission per self report"; and a "Personality Disorder Not Otherwise Specified with Antisocial Features." Dr. Finnberg noted that Father "ha[d] provided very little emotional support or structure for his four children" and had admitted having physically abused J.J. and A.J. She observed that Father had an extensive criminal record, including two stints in Washington State Prison, and had a long history of drug and alcohol abuse. In the 33 years since he had started using drugs and alcohol, Father admitted that, despite attending a number of substance abuse programs, the maximum amount of time he had been able to stay clean and sober was one year (excluding the periods in which he was incarcerated). Characterizing as "admirable" Father's desires to have contact with his children and to in fact have custody of them, Dr. Finnberg opined that "it is not realistic for [Father] to become their primary parent," because (1) he had not shown any sustained interest in the children in the past; (2) he had not played an active role in their lives; (3) the minors have "serious needs"; and (4) J.J. and A.J. are afraid of Father and want no contact with him.

In his conclusion, Dr. Finnberg found that "[e]ach of these disorders, psychiatric, drug, and personality, . . . render[s Father] unable to care for his children, especially in light of the children's emotional and developmental needs. In addition, his responses indicate that he has a great potential for violence towards the children now and in the future. [¶] Due to the chronicity and severity of these disorders, . . . it is not likely that he can overcome these disabilities within the time allotted by law to move towards or achieve reunification with the children." Dr. Finnberg therefore recommended that no reunification services be offered to Father because "his mental disabilities render him incapable of utilizing [them], such that even with the provision of such services, he is unlikely to become capable of adequately caring for the children and have the children returned to him within the reunification time allowed by law."

18

D. *Department's Report, Notice of Hearing, and Addendum*

The Department submitted a report on June 27 in advance of the six-month review hearing in each of the four cases. It detailed the history of the proceedings, referenced the reports prepared by various professionals concerning the minors, Mother, and Father, and in particular referred to the psychological evaluations of Mother and Father prepared by Dr. Lee and Dr. Finnberg. The social worker noted in the report that Father "continues to state . . . that he 'did nothing wrong' and he takes no responsibility for his actions that resulted in the children's dependency. . . . During his meetings with [the social worker], [Father] yelled and slammed doors after walking out of the meetings." According to the Department, Father (a) did not complete a drug and alcohol assessment with the County's Behavioral Health Department; (b) had made no attempt to enroll in an inpatient treatment program; (c) had self-enrolled in a Merced County "Level 1" outpatient treatment program and had provided the Department with a certificate of completion; (d) had not signed necessary releases permitting the social worker to speak with his drug and alcohol counselor in Los Baños concerning Father's progress during that outpatient program; (e) had not provided copies documenting his attendance at AA/NA meetings; (f) had not allowed the appointed Parents as Teacher (PAT) representative, L'Shanna Klein, to participate regularly with his visitations with K.T. and S.M.T., even though mandated as part of his case plan, and had been angered that Klein was "interfering with his time with his children"; and (g) had completed a mandated parenting education program, but had not disclosed to the instructor anything about the dependency proceedings or his prior abuse of the children.

The social worker noted that from her observation of Father's one-hour weekly supervised visitations with K.T. and S.M.T., he "appears to over[-]excite [K.T.] to the point that he [cannot] contain himself. Often[]times [K.T.] runs out of the room or begins throwing toys or destroying items in the visitation room. [F]ather also appears to

19

maintain little supervision over [S.M.T.] during the visitation, due to [K.T.'s] behavior. For example, the [social worker] observed that [S.M.T.] was jumping on the couch in the visitation room and [F]ather did not notice. [S.M.T.] fell off the couch and hit her head on the floor."

The Department concluded that "[F]ather has failed to take any responsibility for the physical and sexual abuse that the children report. The [F]ather also attributes the children's reports to [their] being manipulative or angry at him. The [F]ather continues to deny that he abused his children, in addition to leaving them in the [M]other's care. The [F]ather has actively refused services and has also attempted to avoid the Department's oversight."

The Department recommended that the court make a number of findings, including a finding that both parents had failed to participate regularly in court-ordered treatment programs. It also recommended that the court find, based upon the conclusions of two qualified mental health professionals, that both parents suffered from a mental incapacity or disorder that rendered them unable to care for and control adequately the minors and also rendered them incapable of utilizing child welfare services such that, were they provided, it was unlikely that either Mother or Father would be capable of adequately caring for the minors and would be unlikely to achieve reunification within six months. The Department requested that the court maintain the dependency of the minors; continue the minors in out-of-home care; set a selection and implementation hearing under section 366.26; and terminate reunification services to Mother and Father.

The Department served and filed notices of hearing with respect to each case on June 27. In each notice, the Department advised that it was seeking a change in orders or services at the six-month review hearing, namely, termination of family reunification services.

20

In an addendum report filed September 19, the Department requested that the court make a finding that there had been compliance with the notice requirements of the Indian Child Welfare Act (ICWA) and that the ICWA did not apply.

E.     *Visitation Report*

The Department filed a July 16 report prepared by Dr. Donahue containing her opinions based upon her having observed three videotaped visitation sessions involving Father and the two younger children, K.T. and S.M.T.  Dr. Donahue acknowledged that Father had implemented some of the positive parenting techniques learned during parenting classes he had attended.  She observed, however, that "[o]f concern is that he may be deliberately managing his impression to appear more favorable, as his positive behaviors decreased when the PAT teacher is not present or when the supervising service aide briefly leaves the room.  For example, the supervising service aide left the room . . . at which point [K.T.] was yelling. . . . [Father] told [K.T.], 'You are being mean today,' a comment reflective of a parenting technique that is not developmentally appropriate."  Father, in Dr. Donahue's opinion, did "not demonstrate[] appropriate utilization of techniques for eliminating negative behavior, using appropriate discipline, or facilitating a safe environment thus far.  When [K.T.] and [S.M.T.] screamed and yelled, he initially told them to stop in a calm voice, but quickly escalated into yelling at them.  When this happened, [K.T.] became dysregulated and scared; he screamed every time; on one occasion he backed into a corner between a book[]shelf and a couch[;] and on multiple occasions he ran out of the room yelling for his foster dad."

Dr. Donohue concluded that both children exhibited "trauma reactive symptoms" in their dealings with Father.  Father demonstrated that he did not have an understanding of his children's development, and particularly did not understand that acting out behaviors were common for four-year-old children such as K.T., and even more common with such children, as K.T., who showed developmental delays.  Dr. Donahue also

21

observed that Father "exhibits favoritism of [S.M.T.]," evidenced by his inconsistency in treating K.T. and S.M.T. for similar behaviors. Dr. Donahue expressed concern that Father regularly yelled at his children in the presence of the service aides and PAT teacher, when one would expect the parent to be on his best behavior. "It raises concern about his parenting style in an unsupervised environment."

### F. Testimony

In addition to the submission of the above-referenced reports, the court heard testimony from three witnesses, each of whom was called by Father.

#### 1. Shannon Wight

Shannon Wight is a drug counselor with Merced County Alcohol and Drugs. She was Father's alcohol and drug counselor in a weekly outpatient program he attended from January 18 to April 11. He attended approximately 15 hours of group sessions and two hours of individual session. As part of the program, Father attended 25 AA/NA meetings and obtained a sponsor.[16] Wight tested Father weekly for drugs and alcohol; all tests were negative. Father successfully completed the program and received a certificate. During his enrollment, Father told Wight that he needed an assessment and possible enrollment in a treatment program, and that there was a pending dependency proceeding involving an allegation of the parents' failure to protect their children. He did not disclose to Wight that there were allegations that he had physically abused and sexually abused the children.

#### 2. Lun Wang

Lun Wang is the social worker from the Department handling the case. It was her recollection that the psychological evaluations of Mother and Father were ordered at the jurisdictional/dispositional hearing. Wang never spoke to Wight about Father's participation in the outpatient drug and alcohol program in Merced County; she asked

---

[16] The program required that he attend at least 10 AA/NA meetings.

Father for Wight's telephone number, but he did not provide it to her. Wang also asked Father for a release authorizing her to speak to Wight; Father did not provide one.

### 3. *Michael J.*

Father testified that he completed a 16-week parenting class commencing in January. He claimed that as of the hearing on October 30, he had been clean and sober for two years. He suffered brain trauma after sustaining a skull fracture in May 2012. Father told social worker Wang that he had been enrolled in a drug and alcohol treatment program in Los Baños and had signed a release. He admitted that he did not give Wight's contact information to Wang, but said that Wang did not ask for it. Father testified that he had completed everything that had been required of him in the parenting plan furnished him by the Department. He denied that he had ever physically or sexually abused any of his children.

On cross-examination, Father agreed that he had not completed an alcohol and drug assessment in Salinas. He also admitted that he had never completed a residential drug and alcohol treatment program. Father also testified that he had attended more than 25 AA/NA meetings since January 2013.

### G. *Order After Six-Month Review Hearing*

After considering the reports and testimony and after hearing argument from Father and the Department,[17] the court adopted the findings and orders as recommended by the Department. The court reasoned that Father had not been forthcoming with either psychologist about his drug and alcohol abuse and was not "forthcoming at all about his transgressions with respect to his children." Based upon the court's consideration of the

---

[17] Although the minors and Mother were represented by counsel, neither attorney submitted argument at the hearing.

23

evaluations of Dr. Lee and Dr. Finnberg, the court found that Father "is not capable of meaningfully participating in the kind of therapy that would ameliorate his behaviors and enable him to be an adequate parent, able to protect his children, keep them safe, keep them adequately clothed and housed, and avoid outbursts, angry outbursts behind intoxication that leads [*sic*] to physical abuse of the kids." The court noted further that it had found it an "unusual" feature that the minors were repelled by Father and did not wish to be around him.

There were a number of findings adopted by the court. It concluded that, as to each of the minors, his or her return to the parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The court also found that each of the minors was a member of a sibling group within the meaning of section 366.21(e). It found, by clear and convincing evidence from two competent mental health professionals qualified under Family Code section 7827, subdivision (c), that "the parents are suffering from a mental incapacity or disorder which renders the parents unable to care for and control the child adequately, and which renders [them] incapable of utilizing child welfare services, such that even with the provision of services, the parents are unlikely to be capable of adequately caring for the child and are unlikely to achieve reunification within the next six months."

The October 30 Order also included a finding that the Department had provided or offered reasonable services to both parents, that neither parent had been actively involved in the development of the case plan or the permanent placement plan, and both parents were unwilling to participate in the development of those plans. The court found that both Mother's and Father's progress toward alleviating or mitigating the causes that had necessitated placement of the minors in foster care had been "none." And the court found, based upon clear and convincing evidence, that both Mother and Father "failed to participate regularly and make substantive progress in a court-ordered treatment plan,

24

*and/or* [¶] . . . there is not a substantial probability that the child may be returned to one or both of the parents within six months."  (Original italics.)

The court ordered the scheduling of a selection and implementation hearing under section 366.26 for February 19, 2014.  The court also ordered that family reunification services as to both parents be terminated.

### IV.     *Petition for Writ of Mandate*

Father filed timely under rule 8.450(e)[18] a notice of intent to file a writ petition to review the order setting a hearing under section 366.26.  Thereafter, Father filed his petition for writ of mandate with this court on December 2.  (See rule 8.452.)  Real party in interest Department filed its opposition on December 17.[19]

### DISCUSSION

### I.     *Applicable Legal Principles*

#### A.     *Dependency Law Generally*

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare.  [Citations.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  As our high court has explained, "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.  [Citations.]  The Legislature has

---

[18] All rule references hereafter are to the California Rules of Court.

[19] In its opposition, real party in interest Department erroneously designated itself as "respondent."  No opposition was filed on behalf of respondent superior court.

25

declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

The court at the jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction. (§ 355, subd. (a).) Once such a finding has been made, the court, at a dispositional hearing, must hear evidence to decide the child's disposition, i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions. (§ 361, subd. (a).) If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and convincing evidence establishing that one of five statutory circumstances exists. (§ 361, subd. (c).) One such circumstance is the existence of substantial danger to the dependent child's "physical health, safety, protection, or physical or emotional well-being" were he or she returned to the home. (§ 361, subd. (c)(1).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

Prior to the permanency hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) "At the review hearing held six months after the initial dispositional hearing [the six-month review hearing], the court shall order the return of the child to the physical custody of his

26

or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21(e).) "Review hearings are critical because they are the point at which a parent may be denied further reunification services. [Citation.]" (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61; see also *In re Derrick S.* (2007) 156 Cal.App.4th 436, 450 [reunification is "standard topic at" six-month review hearings].)

### B. *Family Reunification Services*

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.)[20] As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.] But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

A court may order that reunification services be bypassed altogether if one of sixteen circumstances is established by clear and convincing evidence, as specified in subdivision (b) of section 361.5. One such circumstance is where the court finds that "the parent or guardian is suffering from a mental disability that . . . renders him or her incapable of utilizing those services." (§ 361.5, subd. (b)(2); see *In re Ethan C.* (2012) 54 Cal.4th 610, 626.) "These bypass provisions represent the Legislature's recognition

---

[20] "Except as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians . . . ." (§ 361.5, subd. (a).)

27

that it may be fruitless to provide reunification services under certain circumstances. [Citation.]" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.)

Where reunification services are ordered, they generally (subject to exceptions and instances in which the period may be extended) begin with the dispositional hearing and, for children three years or older, end 12 months thereafter. (§ 361.5, subd. (a)(1)(A).) But where a child is under three at the time of his or her initial removal (§ 361.5, subd. (a)(1)(B)), reunification services are normally terminated after six months. And if a child is determined to be a member of a sibling group removed from parental custody at the same time as a sibling who was under three when initially removed, reunification services in that case are also normally terminated for all siblings in the sibling group after six months (§ 361.5, subd. (a)(1)(C).) Although a parent may reasonably expect under most circumstances to receive reunification services for at least the periods designated under section 361.5, subdivision (a)(1), there is no entitlement to services for a prescribed minimum period. (*In re Derrick S.*, *supra*, 156 Cal.App.4th at pp. 445-450 [parent of child over three not entitled to minimum of 12 months of services]; *In re Aryanna C.*, *supra*, 132 Cal.App.4th at pp. 1242-1243 [parent of child under three not entitled to minimum of six months of services].) Thus, "the juvenile court has the discretion to terminate the reunification services of a parent at any time after it has ordered them, depending on the circumstances presented." (*In re Aryanna C.*, at p. 1242.)

At a six-month review hearing, when a child was either under three at the time of his or her initial removal or is a member of a sibling group, the court has the discretion under certain circumstances to set a .26 hearing and to terminate reunification services. (§ 366.21(e); see also rule 5.710(c)(1)(D).)[21] The juvenile court must make "two distinct

---

[21] The operative language is the third paragraph of section 366.21(e), which reads: "If the child was under three years of age on the date of the initial removal, or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, and the court finds by clear and convincing evidence that the parent

28

determinations" in ascertaining whether it has the discretion to set a .26 hearing at the six-month review. (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).) "First, the statute identifies specific factual findings—failure to participate regularly and make substantive progress in the court-ordered treatment plan—that, if found by clear and convincing evidence, would justify the court in scheduling a .26 hearing to terminate parental rights . . . . [¶] The second determination called for by the third paragraph of section 366.21(e), protects parents and guardians against premature .26 hearings. Notwithstanding any findings made pursuant to the first determination, the court shall not set a .26 hearing if it finds either: (1) 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months'; or (2) 'reasonable services have not been provided' to the parent. (§ 366.21(e).) In other words, the court must continue the case to the 12–month review if it makes either of these findings." (*Id.* at pp. 175-176.) But if the court, in making both determinations, concludes that it is thereby empowered to set a .26 hearing, it is nonetheless not *compelled* to do so. The third paragraph of section 366.21(e) merely authorizes the juvenile court, in its discretion, to set a .26 hearing. (*M.V.*, at p. 176; see also *S.T. v. Superior Court* (2009) 177 Cal.App.4th 1009, 1015-1016.) If the court at the six-month review hearing exercises its discretion to set a .26 hearing within 120 days, it must terminate reunification services at that time: "In any case in which the court orders that a hearing pursuant to Section

---

failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing."

366.26 shall be held, it shall also order the termination of reunification services to the parent or legal guardian."  (§ 366.21, subd. (h); see also rule 5.708(n)(1).)

### C. *Standard of Review*

Our review of an order terminating reunification services after a six-month review hearing is, in part, under a substantial evidence standard, and in remaining part, under an abuse of discretion standard.  As explained above, in the case of a child under three or a child who is a member of a sibling group, in order to determine whether a juvenile court is empowered at the six-month review to set a .26 hearing (thereby terminating reunification services), it must first make "two distinct determinations."  (*M.V.*, *supra*, 167 Cal.App.4th at p. 175.)  We review these two determinations by the juvenile court to ascertain whether substantial evidence supports them. (See *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1029; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689 [determination that "there was not a substantial probability of return to parental custody by the 12-month review date" reviewed for substantial evidence].)

In determining whether substantial evidence supports the court's decision, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R.,* at pp. 688-689.) And " ' "[t]he sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoting *Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

30

If the juvenile court's two determinations under the third paragraph of section 366.21(e), supported by substantial evidence, mean that the court is empowered to set a .26 hearing, it may then set such a hearing, but is not required to do so. (*M.V.*, *supra*, 167 Cal.App.4th at pp. 176, 179; see also *S.T. v. Superior Court*, *supra*, 177 Cal.App.4th at pp. 1015-1016.) Thus, we review that decision for abuse of discretion. (*M.V.*, at p. 176; cf. *id.* at p. 182 [if court finds substantial probability that child may be returned to parent within next six months, "the court lacks discretion to schedule a .26 hearing"].) "We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our judgment for that of the juvenile court. [Citation.]" (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.)

II.     *Order Setting .26 Hearing and Terminating Family Unification Services*

Father's challenge to the court's order at the six-month review hearing in which the court set a selection and implementation hearing under section 366.26 and terminated his reunification services is based upon three arguments.   First, he claims that the order requiring him to submit to psychological evaluations constituted a denial of his due process rights and an invasion of his privacy rights.  Second, he argues that the court's admission into evidence of the two psychologists' reports was prejudicial error because there was no evidence that the professionals had the requisite qualifications.  Third, he contends that the court failed to "find a specific legal basis for denying reunification services."

We address these arguments below, each of which is founded on the erroneous premise that the court *denied* reunification services to Father in the first instance, when in fact such services were *granted* and later *terminated* at the six-month review hearing. We then review the challenged order under the proper analytical framework as explained

31

by the court in *M.V.*, *supra*, 167 Cal.App.4th 166: We ask whether there was substantial evidence supporting the court's decision that it could, in the exercise of its discretion, set a .26 hearing (thereby terminating the parents' reunification services), and, if so, whether the court abused its discretion by setting the .26 hearing.

### A.    *Appointment of Psychologists to Evaluate Father*

Father contends that it was improper for the court to order that he submit to psychological evaluations. He argues that the juvenile court ordered him to undergo a psychological evaluation prior to the time that the minors "came within the jurisdiction of the court," and that the order was invalid on this basis. In support of this position, he relies on *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195 (*Laurie S.*). His claim is without merit.

In *Laurie S.*, *supra*, 26 Cal.App.4th at pages 198 to 199, the court—approximately two months after ordering the minor detained at a January 1994 hearing and approximately two months before the jurisdictional hearing—ordered that the mother submit to a psychological evaluation. The mother challenged that order by a petition for writ of mandate. (*Id.* at p. 197.) The mother argued that an order requiring her to cooperate with a psychologist for an evaluation, made before the court had sustained the allegations of a dependency petition, violated her due process rights and her right of privacy. (*Id.* at p. 200.) The appellate court noted that in practice, psychological "evaluations are generally ordered as part of a reunification plan after the child is declared a dependent. [Citation.]" (*Id.* at p. 201.) It held that before the court makes a finding that the child is at risk and the court assumes jurisdiction over the child, an order requiring the psychological evaluation of the parent is unwarranted and violates the privacy rights of the parent. (*Id.* at p. 202.)

The circumstances found in *Laurie S.* do not exist in this case. Here, the court did not order a psychological evaluation of Father prior to the date it assumed jurisdiction

32

over the minors.[22]  At the jurisdictional hearing on January 30, the court found the allegations in the petition true and sustained the petition.  The court also ordered that Father submit to a psychological evaluation.  Based upon the Department's recommendation, the court ordered that Father submit to a psychological evaluation.  Before making the order, the court specifically inquired about Father's position; his counsel informed the court that he did not object to the psychological evaluation.  Since the court did not order a psychological evaluation of Father before it assumed jurisdiction over the minors, and since Father did not object to the order in any event, his challenge of the order under *Laurie S.* fails.

B.      *Admission of Psychologists' Reports*

Father contends that the court committed prejudicial error by admitting into evidence the psychological evaluations prepared by Dr. Lee and Dr. Finnberg.  He argues that there was no evidence that either professional met the qualifications required under Family Code section 7827, and the court erred by taking judicial notice of Dr. Lee's and Dr. Finnberg's respective qualifications.[23]

At the six-month review hearing, when the Department offered the psychological evaluations prepared by Dr. Lee and Dr. Finnberg, counsel for Father objected.  He argued that there was no evidence that the professionals, consistently with the requirements of Family Code section 7827, subdivision (c), held doctoral degrees, and had at least five years of postgraduate experience in the diagnosis and treatment of

---

[22] The record shows that the court did, in fact, order a psychological evaluation of Mother on January 16, prior to the jurisdictional hearing.  Mother was represented by counsel and did not object to the order. In any event, the order requiring a psychological evaluation of Mother is not the order being challenged here.

[23] Department in its opposition to the writ petition does not address Father's contention that the court prejudicially erred by improperly taking judicial notice of the psychologists' qualifications.

33

emotional and mental disorders.[24] The court responded that it would "take judicial notice of the fact that both Dr. Finnberg and Dr. Lee are Ph.D. clinicians. [The court has] personally worked with them and with their analyses in this field . . . since 1997." After Father's counsel objected to judicial notice being taken, the court indicated further that the psychologists' respective practices were not limited to conducting psychological evaluations (as suggested by Father's counsel), but that "[t]hey are treating clinicians. And everybody in the system knows that . . ."

We review the court's admission of the testimony of expert witnesses under an abuse of discretion standard. A trial court's determination of whether an expert has the proper qualifications "is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322; see also *Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1319-1320.) The exercise of "judicial discretion must be measured against the general rules of law." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.)

The court here abused its discretion in basing its admission of the psychologists' evaluations on its judicial notice of the professionals' respective qualifications. There was no evidence presented concerning the qualifications of Dr. Lee and Dr. Finnberg— nothing establishing that they each held a doctorate in psychology and had "at least five

---

[24] Family Code section 7827 is referenced in Welfare and Institutions Code section 361.5, subdivision (b)(2). " 'Mentally disabled' as used in this section means that a parent or parents suffer a mental incapacity or disorder that renders the parent or parents unable to care for and control the child adequately." (Fam. Code, § 7827, subd. (a).) Subdivision (c) of Family Code section 7827 reads in part: "Except as provided in subdivision (d), the evidence of any two experts, each of whom shall be a physician and surgeon, certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code, a licensed psychologist who has a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders, is required to support a finding under this section."

years of postgraduate experience in the diagnosis and treatment of emotional disorders" as required under subdivision (c) of Family Code 7827. And the fact that the trial judge may have been personally familiar with the experts and their qualifications, by itself, did not provide a basis for accepting their evaluations as experts who had the proper qualifications under subdivision (c) of Family Code 7827. A trial judge's personal knowledge of a matter is not a basis for taking judicial notice of that matter, unless the matter is otherwise a proper subject of judicial notice. (*Varcoe v. Lee* (1919) 180 Cal. 338, 344 [fact that trial judge was personally familiar with character of well-known street in San Francisco could not justify his taking judicial notice of that fact]; *Estate of Fulcher* (1965) 234 Cal.App.2d 710, 718 [representations of fact, not submitted as evidence, are not properly subject to judicial notice, even if judge is personally familiar with the represented facts].)

But as we discuss, *post*, there was substantial evidence supporting the court's determination at the six-month review hearing that it could exercise its discretion to schedule a .26 hearing. Under section 366.21(e), the court was not required to find that Father suffered from a mental incapacity or disorder rendering him unable to care for the minors and incapable of utilizing child welfare services. Accordingly, any error in the court's admission of the psychologists' reports without first establishing the experts' qualifications was harmless.

### C.    *Claim of Inadequate Court Findings*

In the most cursory of arguments, Father contends that "[a]s cited above, the juvenile court must find a specific legal basis for denying reunification services. [¶] Furthermore, if the social worker recommends that no reunification services be provided to the parents, the basis for such a recommendation must be specifically stated. (Rule 5.690.) [¶] Here, the court did not make any such findings."

35

We are not required to address undeveloped claims or ones that are inadequately briefed. (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 452, fn. 4.) A party's failure to support its argument with appropriate citations to the record may result in it having its brief stricken and its argument deemed forfeited. (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743.) Here, beyond the matter quoted in the previous paragraph, Father makes no argument in support of his position. It is therefore forfeited.

Even were we to consider Father's claim, it is without merit. Father does not specify what he means by the italicized phrase, "*[a]s cited above*, the juvenile court must find a specific legal basis for denying reunification services." But it appears that he is referencing a discussion five pages earlier in the Petition in which he noted that under section 361.5, subdivision (b), a court must find a statutory circumstance justifying *denial* of reunification services by clear and convincing evidence in order to issue an order bypassing reunification. This claim is untenable because the court here *granted* reunification services to the parents at the jurisdictional and dispositional hearing on January 30. It thereafter *terminated* those services at the six-month review on November 16.[25] For the reasons discussed *post*, the court was not required at the six-month hearing to make a finding under section 361.5, subdivision (b)(2) in order to set a selection and implementation hearing and terminate services previously granted.

---

[25] Father's citation to rule 5.695 concerning the social worker's alleged failure to specifically state a basis for recommending the denial of reunification services is similarly unavailing. Rule 5.695 concerns a court's findings and orders at a dispositional hearing, including the circumstances, consistently with section 361.5, under which it may deny reunification rights to a parent whose child has been removed from his or her custody. The rule is inapposite to the circumstances presented here.

D. *Setting of .26 Hearing Under Section 366.21(e)*

1. *Sibling Group Determination*

There was no dispute that the youngest of the minors, S.M.T., was under three at the time she was initially removed from the home.[26] And there was no dispute that S.M.T. and her two brothers and one sister were members of a sibling group within the meaning of section 361.5, subdivision (a)(1)(C).[27] Each child was "removed from parental custody at the same time," and "one member of the sibling group [S.M.T.] was under three years of age on the date of initial removal." (*Ibid.*) And it was undisputed that each minor was related to the other members of the group as a full sibling. (*Ibid.*) Therefore, given the minors' status, the juvenile court was legally authorized to set a .26 hearing at the six-month review as provided in the third paragraph of section 366.21(e).

We next examine whether respondent court's "two distinct determinations" under the third paragraph of section 366.21(e) were supported by substantial evidence. (*M.V.*, *supra*, 167 Cal.App.4th at pp. 175-176.) We conclude that they were.

---

[26] Construing the date of "initial removal" under section 361.5, subdivision (a)(1)(B) as "the date on which the child was initially removed from the home of a parent or guardian by a peace officer pursuant to section 305 or by a social worker pursuant to section 306" (*In re Christina A.* (2001) 91 Cal.App.4th 1153, 1165, fn. 2), the record shows that S.M.T. was approximately two years, eight months old when she was initially removed from Mother's home.

[27] "For the purpose of placing and maintaining a sibling group together in a permanent home should reunification efforts fail, for a child in a sibling group whose members were removed from parental custody at the same time, and in which one member of the sibling group was under three years of age on the date of initial removal from the physical custody of his or her parent or guardian, court-ordered services for some or all of the sibling group may be limited as set forth in subparagraph (B). For the purposes of this paragraph, 'a sibling group' shall mean two or more children who are related to each other as full or half siblings." (§ 361.5, subd. (a)(1)(C).)

2.    *Treatment Plan Progress*

The court specifically found, as stated in the orders, "based on clear and convincing evidence, the parents failed to participate regularly and make substantive progress in a court-ordered treatment plan."  Father's welfare services case plan included a specific requirement that he "[a]ttend and successfully complete a residential treatment program as recommended by the substance abuse assessment and as approved by the social worker.  Sign all necessary releases."  It also included a requirement that he "[a]ttend and participate in an alcohol/drug assessment with Behavioral Health in Salinas, CA, by <u>February 28, 2013</u>."  (Original underscoring.)

There was undisputed evidence at the six-month hearing that Father did not comply with the court-ordered treatment program.  He did not attend and participate in a drug and alcohol assessment with the Department of Behavioral Health in Salinas.  He admitted this omission.  Father also admitted that he never attended a residential drug and alcohol treatment program as required under his case plan.  He did, however, complete an outpatient drug and alcohol program in Los Baños.  While this activity is commendable, it cannot be considered a substitute for the completion of an in-county residential drug and alcohol treatment program required under his case plan.  There was thus substantial evidence supporting the court's first determination under section 366.21(e) that Father had failed to participate regularly and make substantive progress in a court-ordered treatment plan.

3.    *Substantial Probability of Child's Return to Home*

Addressing the initial aspect of the second determination under section 366.21(e), the court below concluded (in each of the four cases) that "there is not a substantial probability that the child may be returned to one or both of the parents within six months."  As explained in *M.V.*, the statute, which "is unwieldy" (*M.V.*, *supra*, 167 Cal.App.4th at p. 181), does not provide guidance as to the criteria under which a court

38

determines whether this substantial probability standard is met. (*Id.* at p. 176.) "Literally, the statute commands the court to determine whether there is a strong likelihood of a possibility of return." (*Id.* at p. 181.) The court may consider all evidence bearing on the issue. (*Ibid.*) This may include, but is not limited to, the three mandatory factors enunciated by the Legislature in section 366.21, subdivision (g)(1) that a court considers at the 12-month review in deciding whether "there is a substantial probability the child *will be* returned to the physical custody of his or her parent or guardian . . . within the extended period of time . . ." (Italics added.) Those factors are "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Ibid.*) The court may also consider any extenuating circumstances involving the parent that may explain the parent's "relative lack of evidence of satisfying all three factors." (*M.V.,* at p. 183.)

The child visitation factor does not support Father's position. There had been no visits by Father with the twins, A.J. and J.J., based upon the court's prior jurisdictional and dispositional order that no such visitation be provided. That order was in turn based upon the conclusion that such visitation would be detrimental to the children; both A.J. and J.J. reported that Father had physically abused them, they expressed fear of him, and they declined visitations with him. Additionally, there was substantial evidence upon which the court could have found that the visitation factor as to K.T. and S.M.T. was unfavorable to Father. While Father had been attending one hour per week visitation with the younger children, the Department reported that Father tended to overexcite K.T. and maintained little supervision over S.M.T. Dr. Donahue reported that Father did not

39

demonstrate appropriate skills to address his children's negative behaviors, quickly escalated into yelling at them, did not have an understanding of their level of development, and favored one child over the other. From her observation of the visits, Dr. Donahue described K.T. and S.M.T. as exhibiting "trauma reactive symptoms" in dealing with Father. This issue was specifically noted by the court at the hearing: The court indicated that "a feature in this case that's very unusual is that the children [are] repel[led by] him, and they do not wish to be around him. They are afraid of him." Therefore, there was no evidence (substantial or otherwise) that Father "consistently and regularly contacted and visited with the child" as to A.J. and J.J. (See § 366.21, subd. (g)(1)(A).) And because of the problematic nature of his visits with the younger children, there was substantial evidence to support the conclusion that the visitation factor did not favor Father as to K.T. and S.M.T. as well.

There is also substantial evidence favoring the court's conclusion that the second factor—significant progress in resolving problems that led to the child's removal (see § 366.21, subd. (g)(1)(B).)—did not favor Father's position. In the interview with Dr. Lee, Father exhibited deception and denial of his history of drug and alcohol abuse. In Dr. Lee's opinion, he "tended to externalize blame. He did not take responsibility for the state in which the children were living or the fact that they were not attending school. He said that he complained to [Mother] about her drug and alcohol abuse, but did not seem to feel it was his responsibility to protect the children from it." Additionally, the Department's social worker reported that Father had failed to take any responsibility for the minors' reported physical and sexual abuse, had "actively refused services and . . . attempted to avoid the Department's oversight," and had continually denied having physically or sexually abused any of the children. The court, noting that Father's having participated in the Los Baños outpatient drug and alcohol program was "a good thing," nonetheless itemized a number of matters weighing against the notion that Father had

40

made significant progress in addressing the problems leading to the minors' removal. The court emphasized Father's denial of his alcohol and drug problems; his denial of "any wrongdoing whatsoever with respect to physical abuse of his children even though his children both independently and in corroboration of one another have said that he abused them consistently"; and that the psychologists had concluded that he would "not . . . honestly confront his behaviors . . . or honestly confront his mental health issues."[28]

And there was substantial evidence supporting the court's conclusion that the third factor did not favor Father because he had not "demonstrated the capacity and ability . . . to complete the objectives of his . . . treatment plan." (§ 366.21, subd. (g)(1)(C).) As noted above, Father had made no attempt to enroll in and complete an inpatient drug and alcohol treatment program, and he did not attend and complete a drug and alcohol assessment in Salinas as required under his court-ordered plan. Similarly, the circumstances noted above with respect to his failure to make significant progress in resolving the problems leading to the minors' removal also negate the factor that Father had "demonstrated the capacity and ability . . . to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(C).) Additionally, Dr. Lee concluded from her interview and evaluation of Father

---

[28] Father argues briefly (and without citation to the record or to any authority) in his petition that the court erred in precluding testimony from two additional witnesses offered by him at the hearing, Joel Cortez and Father John. Father claims that these witnesses would have offered support for his position that his conduct with his children was "appropriate" and that he "sought out the assistance of a third party regarding financial assistance and counseling." Because Father has not developed this contention with sufficient argument, authority, or citation to the record, it is forfeited. (*People v. Miralrio, supra*, 167 Cal.App.4th at p. 452, fn. 4.) Further, were we to consider the contention's merits, we would reject it. Determinations regarding the admission or exclusion of evidence are reviewed for abuse of discretion. (*People v. Mickey* (1991) 54 Cal.3d 612, 654.) Our review of the record discloses that the court did not abuse its discretion in excluding the proffered testimony.

41

that, given his denial of drug abuse and domestic violence, and his misrepresentation of "his problem areas," it was unlikely, even with treatment and further counseling, that he would be able to see "positive change within the period of time provided by statute." And Dr. Finnberg opined in her evaluation that Father's "disorders, psychiatric, drug, and personality" rendered him unable to care for his children, particularly in light of their emotional and developmental needs.

It is apparent from the record that the court considered the evidence comprehensively, including positive matters such as Father's completion of the outpatient drug and alcohol program, in reaching the conclusion that there was not a substantial probability that the minors might be returned to one or both of the parents within six months. Thus, substantial evidence supported this factor of the juvenile court's decision to terminate reunification services.

#### 4. *Provision of Reasonable Services*

Addressing the other aspect of the second determination under section 366.21(e), the court below concluded that reasonable services were provided or offered to the parents. Father submitted no argument below or in the instant petition that the family services provided or offered by the Department were not reasonable. And Father was offered and received weekly visitation of K.T. and S.M.T. He participated in an out-of-county drug and alcohol treatment program, but there was evidence that he was not candid with the treatment providers concerning the circumstances of the dependency cases involving his children and, according to the social worker, he would not permit her to speak openly to his treatment providers. Similarly, although he completed a parenting education class, he did not disclose to the teacher anything about the instant dependency proceedings or the claimed abuse of his children. Furthermore, he refused to cooperate with the Parents As Teacher representative, Ms. Klein, in visitations with his younger children, even though it was mandated in his case plan.

42

For all of these reasons, there was substantial evidence supporting the court's conclusion that Father was offered or provided reasonable services by the Department.

5.     *Discretion in Setting .26 Hearing*

Under section 366.21(e), there was substantial evidence supporting the court's conclusions that (1) the minors were a sibling group within the meaning of section 361.5, subdivision (a)(1)(C); (2) the parents failed to participate regularly and make substantive progress in a court-ordered treatment plan; (3) there was not a substantial probability that the minors might be returned to one or both of the parents within six months; and (4) reasonable services were provided or offered to the parents.  Based upon these supported findings, the court, in its discretion, could set a .26 hearing and terminate family reunification for the parents.  (*M.V.*, *supra*, 167 Cal.App.4th at pp. 176, 179.)  Based upon the record before us, therefore, it was not an abuse of discretion for the court to have set the .26 hearing here.

## DISPOSITION

The petition for writ of mandate is denied. Statutory costs are awarded to real party in interest.

_____

Márquez, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Premo, J.