Filed 8/29/22 In re S.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent; v. S.M., Defendant and Appellant. | E077950 (Super.Ct.No. J286681) OPINION |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

S.M. (Father) appeals from the juvenile court's order terminating family reunification services with his daughter, S.M., at the 12-month review hearing. His sole argument is that the record does not contain substantial evidence supporting the court's finding that reasonable services were offered or provided to him while he was incarcerated. We disagree and affirm.

## BACKGROUND

### A. *Referral and Detention*

San Bernardino County Children and Family Services (CFS) received an anonymous referral on August 22, 2020, alleging general neglect by both parents and that Father was selling drugs out of the home while nine-year-old S.M. was present. CFS dispatched a social worker to the home, but she was denied access to the residence and the child. Parents scheduled two subsequent home visits with the social worker but failed to open the door at the appointed times and texted the social worker saying they were out of town. CFS requested that law enforcement conduct a welfare check on S.M., but she was not at the home, and parents refused to divulge her whereabouts. S.M.'s school reported that she was enrolled but had not attended in two or three days. CFS contacted

2

S.M.'s maternal great-grandfather and other family members,[1] who said the child had not been seen in about a month.

CFS obtained records showing law enforcement received several recent calls for service regarding domestic disturbances at the family's residence, including a report of firearm storage at the home on August 21, a verbal altercation six days later, and a report of someone being pistol-whipped and an occupant pointing a gun at residents the following day. On August 28, 2020, law enforcement confirmed that armed individuals were guarding the home. Records from the property management company for the

_____

[1] The record is unclear as to the identity of those family members and their relationship to S.M. and notes that "social workers interviewed many collaterals without success in locating child." This court in *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 745-746 cautioned against CFS's use of "'collaterals'" and other "imprecise terminology" that fails to provide sufficient information about the persons contacted to adequately document the agency's compliance with its duty of inquiry under state law implementing the Indian Child Welfare Act of 1978 (25 U.S.C. §§ 1901 et seq.) (ICWA). We note that the record reflects CFS communicated with many of S.M.'s relatives, including those who meet the statutory definition of "'extended family member'" (Welf. & Inst. Code, § 224.1, subd. (c); 25 U.S.C. § 1903(2)) (e.g., maternal uncle in Oregon, maternal grandparents in Oregon, maternal aunt and uncle in Alabama, and paternal grandparents in California) and those who, although not classified as extended family members, are "others who have an interest in the child" (Welf. & Inst. Code, § 224.2, subd. (b)) and who would appear likely to have relevant information (e.g, maternal great-grandfather and other unidentified family members and maternal great-aunt with whom S.M. was placed for more than four months), yet there is no indication in the record that CFS asked any of these relatives whether the child is, or may be, an Indian child. The CFS reports appear to be in conflict on whether ICWA applies: The June 10, 2021, status review report states without elaboration that ICWA "does or may apply," whereas previous and subsequent reports state that ICWA does not apply. Because the present record does not contain any findings by the juvenile court as to whether ICWA applies, we remind CFS of its statutory duty pursuant to Welfare and Institutions Code section 224.2, subdivision (b), to ask the child's extended family members and others about the applicability of ICWA.

3

apartment complex where the family resided included several recent notices of leasing violations, including for disturbing the peace, open substance use and criminal activity on the premises, unauthorized occupants, discarded furniture and debris blocking a public walkway, a physical altercation between the parents in the parking lot, and a report that S.M. was playing unsupervised in the complex at 3:00 a.m.

S.M. had been the subject of three prior CFS referrals. Two referrals in 2017-2018 alleged the parents' neglect and emotional abuse of S.M. concerning both parents' violent interactions with others and Father's October 2017 arrest for possession and transportation of controlled substances. Those referrals were closed as inconclusive after Father pled guilty and was sentenced to 16 months in prison, and CFS was unable to locate S.M. or Mother. A third referral concerned a 2019 incident of sexual abuse of S.M. by her paternal uncle, leading to his arrest and conviction for violating Penal Code section 288, subdivision (b)(1). CFS interviewed parents but was unable to complete the investigation after S.M. became so upset about the sexual abuse that she began vomiting, and her forensic interview was cancelled. Father's criminal history also includes two convictions for assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and a concealed weapons offense (Pen. Code, § 20510).

On September 17, 2020, CFS obtained and served a detention warrant to ensure S.M.'s safety. During the search of the residence, parents were hostile and "laughingly" told the social workers and law enforcement that they would not find S.M. because she

4

was already on her way to live with relatives out of state, but parents would not disclose the child's whereabouts.

On September 21, 2020, CFS filed a dependency petition alleging S.M. came within the provisions of Welfare and Institutions Code section 300, subdivision (b) (failure to protect), resulting from both parents' untreated substance abuse and domestic violence and Father's engagement in dangerous criminal activities. (Unlabeled statutory citations refer to this code.) A detention hearing was held the next day, at which Father was present and testified that he and Mother had completed papers online to grant custody of S.M. to her maternal uncle and sent her to live with him in Oregon. After the court informed Father that the purported Internet custody transfer was not binding, that a detention warrant for S.M. had been issued, and that failure to cooperate in locating and delivering the child to CFS would subject him, Mother, or other family members to criminal prosecution for child abduction, Father provided contact information for maternal uncle. The court found a prima facie case for detention of S.M. and set a jurisdiction and disposition hearing for October 13, 2020. Two days after the detention hearing, the court issued a warrant of protective custody for S.M. (§ 340, subd. (b).)

B. *Jurisdiction and Disposition Reports and Hearings*

The day after the detention hearing, police were called to Father's residence after he became violent, brandished a gun, threatened to kill Mother, and forced her into his car in view of multiple witnesses. When Mother escaped from the car, Father sped away and was arrested eight days later after a motorcycle chase, with 16 grams of

5

methamphetamine in his possession. A search warrant was executed at Father's apartment, and ammunition, a stolen passport, and a stolen check were found. When interviewed by police, Father denied knowing about the ammunition, denied any domestic violence or having forced Mother into his vehicle, and stated that he had grabbed Mother to console her, that witnesses had lied, and that Mother's statements had been coerced. CFS contacted the jail where Father was being held but was unable to interview him because of COVID-19 restrictions.

CFS reported that S.M. had been transported out of California by the maternal grandparents on September 26, 2020, to stay with a maternal uncle in Oregon. She was located two days later, transported back to California, and placed at the home of a maternal great-aunt on September 30, 2020. When interviewed by the social worker, S.M. was shy, quiet, and distant. She denied any knowledge of her parents' substance abuse, and also denied any physical abuse or physical discipline. She confirmed that her paternal uncle had "'touched her one time'" and had been sent to prison for it, and she became visibly upset and cried when asked about her parents fighting and domestic violence, saying she wanted her parents to attend classes to learn to speak to each other nicely. She also indicated she would like to speak with a therapist. When interviewed by phone, Mother was described as not forthcoming or honest. She reported Father was a retired gang member but denied knowing anything about that part of his life, and she denied any domestic violence or substance abuse in the home, despite Father's having

6

been arrested with 16 grams of methamphetamine three days earlier after threatening her at gunpoint and forcing her into his car.

Father remained incarcerated and was not present at the jurisdiction and disposition (J/D) hearing on October 13, 2020. The court continued the matter to November 2, 2020, and ordered that Father be transported for that hearing. On October 29, 2020, CFS informed the court that Father had pled guilty to the criminal threats charge and was sentenced to three years of felony probation with a 90-day jail term and a projected release date of November 13, 2020. The jail's COVID-19 restrictions prohibited in-person visits, and CFS received no response to its request for a telephone interview of Father. When Father was again not present at the further J/D hearing on November 2, the court continued the matter to December 2, 2020, to allow CFS to interview Father upon his anticipated release from custody.

After Father was released from jail on November 13, 2020, the social worker made numerous unsuccessful attempts to reach him. However, the contact number he provided was unable to accept calls or messages, and Father had not reached out to CFS or to S.M.'s caregiver. Father and Mother were both arrested on November 26, 2020, for possession of drug paraphernalia after two methamphetamine pipes were found in their residence. Mother was cited and released, while Father was charged with a parole violation and remained incarcerated. At the further J/D hearing on December 2, 2020, Father was not present and failed to respond to his counsel's attempt to make contact. The court sustained the allegations of the petition, declared S.M. a dependent pursuant to

7

subdivision (b) of section 300, adopted the findings and orders of the J/D report, approved the case plan, found Father to be S.M.'s presumed father, ordered family reunification services for Father, and set a six-month status review hearing for June 2, 2021.

C. *Six-Month Review Period*

In February 2021, S.M. was removed from the home of maternal great-aunt and placed in a foster home. At the six-month review hearing on June 2, 2021, the court authorized CFS to initiate assessment of placement with maternal grandparents in Oregon pursuant to the Interstate Compact on the Placement of Children (ICPC) (Fam. Code, § 7900 et. seq.). As there had been no contact with Father during the review period, the court continued the hearing to July 1, 2021, to allow CFS time to locate Father and update its findings, orders, and report to include him. On July 1, 2021, CFS reported that Father had been located at North Kern State Prison with a scheduled release date in December 2021 and that Father would be provided a letter of introduction with information enabling Father to contact the social worker regarding S.M. At the hearing on July 1, 2021, Father's counsel submitted on CFS's recommendation of continued services for Father, and a 12-month status review hearing was set for October 13, 2021.

D. *Twelve-Month Review Period*

CFS's 12-month status report stated that Father, who was now incarcerated at Centinela State Prison, called the social worker weekly, stating that he hoped to be released from custody either October 8 or November 10, 2021, and that he was ready to

begin his court-ordered services upon his release. The report noted that Father had been ordered to participate in domestic violence classes, general counseling, parenting education, safety support network, substance abuse classes, a 12-step program, and substance abuse testing, and that the social worker had no opportunity to assess Father's behavior or willingness to participate in these services. The social worker spoke with Father's counselor at Centinela State Prison, who reported that no rehabilitative services were being offered at the time because of COVID-19. The counselor believed services would be offered outside where inmates could safely distance, but that was not possible at the time because of extreme heat, with temperatures as high as 115 degrees. The social worker tried to follow up with the manager of rehabilitative programs at the prison and was unable to make contact, but the worker did speak with the manager's assistant, who confirmed that because of pandemic restrictions, rehabilitative services were not being offered at that time.

The 12-month review hearing (§ 366.21, subd. (f)) was held September 29, 2021. S.M.'s counsel requested that the court terminate services for both parents. As to Father, S.M.'s counsel noted that although his anticipated release date was reported as six weeks away, he would still have to complete his entire case plan—including a domestic violence program, counseling, parenting classes, safety support network, substance abuse program, and random drug testing—by the 18-month review hearing. Minor's counsel argued that there was no substantial probability of S.M.'s return to Father by the end of the next

9

review period and requested the court terminate his reunification services. Father's counsel requested that services be continued.

The court found by clear and convincing evidence that reasonable services had been provided to both parents and that parents had failed to make substantive progress in the court-ordered case plan. Regarding Father, the court stated, "I know he is in the joint right now. He has an opportunity to take classes. He said if he had to sit outside to do them in 115-degree temperatures, but they were otherwise available. It's hard to see, based on what I have read here—I find services to be reasonable. I can't say that I find the substantial likelihood of return in the next reporting period. So I will terminate services against Parents' counsel's request." The court found a compelling reason not to set a section 366.26 hearing, ordered that S.M. remain in foster care with a permanent plan of placement with a fit and willing relative, and authorized initiation of ICPC placement with maternal aunt and uncle in Alabama. The court terminated reunification services for both parents and set a permanency planning review hearing for March 25, 2022.

## DISCUSSION

"Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.) "To achieve the goal of preserving the family whenever possible, the

10

Legislature required the county child welfare departments to develop and implement family reunification plans and required the courts to monitor those plans through periodic review. Family reunification efforts are required to begin with the first determination the child will be detained in juvenile court custody. [Citations.] Thereafter the court must review the case at intervals of no less than six months and determine, among other things, whether reasonable reunification services have been offered. [Citations.]" (*In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211.)

Incarcerated parents are entitled to reasonable reunification services, whatever the likelihood of success, unless the court finds it would be detrimental to the child. (*In re T.G.* (2010) 188 Cal.App.4th 687, 696 (*T.G.*).) The adequacy of the reunification plan and of the agency's efforts to provide suitable services is judged according to the circumstances of the particular case. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 (*Ronell A.*).) "'"[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult."'" (*T.G.*, at p. 697.) "'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] 'The applicable standard of review is sufficiency of the evidence. [Citation.]'" (*Ibid.*) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination.

We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) "The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings." (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

A juvenile court's finding that reasonable reunification services were provided must be made by clear and convincing evidence. (§ 366.21, subd. (g)(1)(C)(ii).) In reviewing that finding, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

Father argues that the juvenile court's reasonable services finding is not supported by substantial evidence because services were not being offered at the prison where he was incarcerated, but the juvenile court mistakenly believed that classes were available and Father refused to participate. Father bases his argument entirely on the following remarks by the juvenile court: "The father—I know he is in the joint right now. He has an opportunity to take classes. He said if he had to sit outside to do them in 115-degree temperatures, but they were otherwise available." Father claims this statement shows the court "erroneously believed that Father chose not to participate in services" because he "did not want to sit outside in the heat." CFS argues the court's statement is consistent with the information provided by Father's counselor, who told the social worker that he "believes services would be offered if services could be conducted outside which would

12

allow the inmates to distance themselves, but due to the daily extreme heat that range as high as 115 degrees, it is impossible." CFS argues it is reasonable to infer from this that classes would be offered outdoors once the extreme heat subsided, and the court's statement shows it correctly understood that but for the 115-degree daily temperatures, classes at the prison would have been available to Father.

We need not resolve these competing interpretations of the juvenile court's remarks, because there is ample evidence to support the court's finding that CFS provided Father with reunification services that were reasonable under the circumstances. (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 38 ["we review the lower court's ruling, not its reasoning; we may affirm that ruling if it was correct on any ground"]; *In re Zamer G.* (2007) 153 Cal.App.4th 1257, 1271.)

A court-ordered reunification plan must be tailored to fit the circumstances of each family and designed to eliminate the conditions that led to the juvenile court's jurisdictional findings. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.) Father does not deny that the case plan developed by CFS and approved by the court identifies Father's domestic violence, substance abuse, and criminal activities that led to his loss of custody of S.M. and includes services "that were designed to aid [Father] to overcome the problems that led to the initial removal and continued custody of the child." (§ 366.21, subd. (f)(1)(A).) Father never objected to the case plan in the juvenile court and did not appeal the court's December 2, 2020, disposition order adopting the case plan or its July 1, 2021, order continuing the case plan

13

as adopted. Indeed, at both hearings, Father's counsel expressly submitted on CFS's recommendations as to reunification services. (See *In re Richard K.* (1994) 25 Cal.App.4th 580, 588-590.) Accordingly, to the extent Father challenges the case plan as unreasonable because it included services to which he did not have "actual access" while incarcerated (§ 361.5, subd. (e)(1)(D)(ii)), the argument is forfeited. (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 527-528; *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811-812.)

Not only were services appropriately tailored to remediating the problems leading to the child's removal, the record also reflects that CFS maintained reasonable contact with Father, notwithstanding Father's repeated failures to inform the court or CFS of his whereabouts. Father was present along with his court-appointed counsel at the detention hearing on September 22, 2020, at which his counsel requested referrals for services. Father provided his mailing address and was notified of the requirement that he inform the court in writing of any address changes. (§ 316.1, subd. (a).) Despite receiving that advisement, Father failed to notify the court, his counsel, or CFS when he was arrested on October 1, 2020, on charges of making criminal threats that would result in death or great bodily injury while armed with a firearm, transporting a controlled substance, and theft. When CFS learned of the arrest, a social worker attempted to interview Father but was unable to because of the jail's COVID-19 restrictions. Father was released from custody on November 13, 2020, but failed to notify CFS or the juvenile court that he had been released. The social worker made numerous attempts to reach Father at the phone

14

number he had provided the court in September, but his phone was not accepting calls or voicemails. CFS continued trying to locate Father until the afternoon of November 30, 2020, when the social worker learned that he had been arrested again four days earlier and charged with a parole violation after having been found in possession of drug paraphernalia. Mail sent December 3, 2020, to Father at the jail where he was booked was returned indicating he was no longer in custody, but Father again made no attempt to contact CFS, his counsel, the juvenile court, or his child, and his whereabouts remained unknown until July 1, 2021, when a social worker notified the court that Father had been located in state prison and would be sent instructions to contact her. At some point thereafter, Father established contact with the social worker and maintained weekly calls for the less than three months remaining in the reunification period. The record also shows the juvenile court made repeated efforts to include Father in the proceedings, ordering that he be transported to hearings when it knew he was in custody and repeatedly continuing the proceedings to allow time for CFS to locate him when his whereabouts were unknown.

CFS also fulfilled its obligation to make reasonable efforts to assist Father in areas where compliance with his case plan proved difficult and fulfilled its statutory obligation to document the particular barriers to Father's access to court-ordered services. (§ 361.5, subd. (e)(1)(D)(ii).) After locating Father in state prison and establishing contact, the social worker contacted Father's prison counselor to inquire about available services. The counselor stated that no services were being offered at the prison at that time because

of COVID-19 restrictions but that he believed services would be offered outside absent the daily extreme heat. The social worker then attempted to contact the prison's manager of rehabilitative programs to inquire if services were being offered. Although the social worker was unable to make contact with the manager, she did confirm with the manager's assistant the information provided by Father's counselor.

In *T.G.*, *supra*, 188 Cal.App.4th 687, this court rejected a father's claim that he had received inadequate services while incarcerated. We found substantial "evidence showing the social worker did all that was required under the circumstances," (*id*. at p. 699) and we concluded that it was father's failure to notify the social worker that he had been arrested and was no longer residing at the address he had provided at the detention hearing that caused the agency to be unable to locate him for five months. (*T.G.*, at pp. 698-699.) Similarly, here, Father's failure to inform the social worker, his counsel, or the court of his whereabouts caused CFS to be unable to provide any reunification services for the first nine months that S.M. was in foster care. By the time CFS located Father and established contact, less than three months remained of the statutory reunification period, and no services were being offered at his place of incarceration.

Although Father acknowledges that CFS had no control over the pandemic, the extreme weather, or the prison's suspension of rehabilitative services, he nevertheless insists that the lack of services at the prison "indicates CFS's failure to provide reasonable services" and precludes a finding that reasonable services were offered or

16

provided. Those arguments are foreclosed by cases that have consistently held that a social services agency cannot be held responsible for the lack of availability of services at a correctional facility. (See *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1013 (*Mark N.*), superseded by statute on other grounds as indicated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504; *Ronell A.*, *supra*, 44 Cal.App.4th at p. 1363; *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1031-1032 (*Fabian L.*).) In *Mark N.*, the court explained that a social services agency has an obligation to "preliminarily identify services available to an incarcerated parent. [Citation.]" (*Mark N.*, at p. 1012.) But if "no services were available to [father] in prison . . . , his inability to participate was not the department's fault. [Citation.] The prisons are run by the Department of Corrections, not by the [Department of Children and Family Services]. [Citation.]" (*Id.* at p. 1013.) Similarly, in *Ronell A.* the court concluded that the social worker had reasonably attempted to provide services by investigating what services were available to mother while she was incarcerated. The fact that "mother was only able to participate in such programs at the end of her sentence is not the fault of the department. Nor was the department in any position to rectify this problem: prisons are run by the Department of Corrections, not the department of children's services." (*Ronell A.*, at p. 1363.) Contrary to Father's arguments, the fact that prison policies restricted his ability to participate in services while incarcerated does not establish that CFS failed to offer or provide reasonable reunification services. (*Fabian L.*, at p. 1029 ["services provided to Father as an incarcerated parent were reasonable" notwithstanding that prison

facility "could not offer Father any meaningful reunification-relevant resources"]; *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1111 & fn. 4 [substantial evidence supported reasonable services finding; agency was not responsible for the fact that parent was incarcerated in another state whose officials hindered their efforts]; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 971 [services to father were reasonable notwithstanding "that he was confined for the greater part of the reunification period in a distant, out-of-state prison" where no services could be provided].)

As the court explained in *Mark N.*, "the department cannot tell prison officials how to run their institutions," but it can "notify the prison an incarcerated parent is in need of reunification services; determine whether any appropriate services are available at the particular institution in question; and explore whether changes . . . can be made to facilitate the provision of such services consistent with legitimate prison and public safety concerns." (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1013.) The record shows CFS did exactly that: It contacted Father's prison counselor to discuss the services Father needed, determined the prison was not offering services at that time, and explored the possibility that services could be offered outdoors.

The cases cited by Father provide no support for his contention that the juvenile court's reasonable services finding was not supported by substantial evidence. In *Fabian L.*, as in this case, the facility where the father was incarcerated "could not offer [him] any meaningful reunification-relevant resources," and he "had no access to drug treatment, counseling, anger management (to address his issues with domestic violence),

18

or a parenting class." (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1029.) Notwithstanding the unavailability of services at the prison, the court found that "[t]he services provided to [f]ather as an incarcerated parent were reasonable," and his "case plan was the best it could be given his location" in a prison that "did not offer any reunification-related services." (*Id.* at pp. 1029, 1032.) Although the court noted that "under section 361.5, [f]ather was not expected to participate in services that were not available," it held that the prison's lack of services did not constitute "evidence of unreasonable services" provided by the agency. (*Id.* at pp. 1029, 1031-1032.) Father attempts to distinguish *Fabian L.* on the ground that the father in that case was not scheduled to be released soon. The attempt fails, however, because *Fabian L.* did not rely on that fact in determining that there was sufficient evidence of reasonable services. Rather, the father's distant release date showed that there was no substantial probability of return. (*Id.* at pp. 1031-1032.) Here, father's relatively closer release date has no tendency to show that the services provided by CFS during the review period were not reasonable.

Father's reliance on *S.T. v. Superior Court* (2009) 177 Cal.App.4th 1009 (*S.T.*) is equally misplaced. Father claims that "it was error for a juvenile court to find reasonable services were provided" to the incarcerated father in *S.T.* Not so. The appellate court in *S.T.* expressly declined to "decide whether the [department] provided father with reasonable reunification services." (*Id.* at p. 1015.) Instead, it held that the juvenile court "applied the wrong legal standard in determining whether to continue family reunification services or terminate them and set a [permanency planning] hearing." (*Id.*

at p. 1016, citing *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 180-181.) The juvenile court had failed to exercise its discretion under section 366.21, subdivision (e), which governs six-month review hearings, and mistakenly applied subdivision (g)(1), which only comes into play if the child is not returned to the parent's custody at the 12-month review hearing. (*S.T.*, at pp. 1015-1016 & fn. 7.) *S.T.* therefore has no relevance to this case, where the juvenile court applied the correct standard at the 12-month hearing, and Father does not contend otherwise.

For all of the above reasons, we find substantial evidence in the record supports the juvenile court's finding that the reunification services provided or offered to father were reasonable under the circumstances.

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____
J.

We concur:

MILLER_____
Acting P. J.

SLOUGH_____
J.